Ivan C. McLEOD, Regional Director of the Second Region of the National Labor Relations Board, Petitioner,

v.

NATIONAL MARITIME UNION OF AMERICA, AFL–CIO, and Commerce Tankers Corporation, Respondents.

NATIONAL MARITIME UNION OF AMERICA, AFL–CIO, Plaintiff,

v.

COMMERCE TANKERS CORPORATION, Defendant,

v.

VANTAGE STEAMSHIP CORP., Intervening Defendant.

Nos. 71–Civ. 2300, 71–Civ. 582.

United States District Court, S. D. New York.

June 22, 1971.

As Amended July 15, 1971.

Edwin H. Bennett, New York City, for petitioner.

Abraham E. Freedman, New York City, for National Maritime Union of America, AFL–CIO; by Charles Sovel, New York City, of counsel.

Marshall, Bratter, Greene, Allison & Tucker, New York City, for Commerce Tankers Corporation; by Charles Miller, Naomi L. Reice, New York City, of counsel.

Surrey, Karasik, Greene & Seham, New York City, for Vantage Steamship Corp.; by Martin Seham and Hill, Betts & Nash, New York City, by John Lang, New York City, of counsel.

## OPINION

CROAKE, District Judge.

Because of the procedural situation, to be described, this one opinion shall apply as indicated to the two separate but related actions captioned above. A motion is pending in each matter; in the first, the National Labor Relations Board ("NLRB") seeks a preliminary injunction against alleged violations by respondents of 29 U.S.C. § 158(e), pending final determination of the issue by the NLRB itself. In the second action, the court is requested to vacate a preliminary injunction previously entered against defendants.

### I

Both actions grew out of the same factual context. Commerce Tankers Corporation ("Commerce"), a subsidiary of Vernitron Corporation, holds title to the tanker "Barbara," and previously owned a second ship, now sold. Commerce is party to an agreement with National Maritime Union of America, AFL-CIO ("NMU"), under which NMU is recognized as the sole collective bargaining agent for the unlicensed seamen aboard the "Barbara." This agreement contains a provision that if the "Barbara" is sold for operation under the United States flag, Commerce will obtain from the purchaser a written undertaking, for the benefit of NMU, that the agreement between NMU and Commerce will continue to apply to the operation of the Barbara and that the purchaser will comply with the said agreement—in other words, that NMU will continue to be the collective

bargaining agent for the crew. The agreement provides for arbitration.[1]

There are two major unions representing unlicensed seamen on American flag vessels: NMU and the Seafarers' International Union ("SIU") which are intense rivals. To preserve some labor-management stability in the maritime industry, the practice has evolved and has been sanctioned that collective bargaining agreements should usually cover the crew members of all vessels in a fleet owned by a single employer and its related companies. Moore-McCormack Lines, Inc., 139 NLRB 769 (No. 70), 51 LRRM 1361 (1962)[2] A corollary of this principle is that newly-acquired vessels are generally considered as "accretions" to a fleet, with union representation of the crew passing to the union representing the newly augmented fleet. National Maritime Union of America [NMU] (Overseas Carriers Corp.), 174 NLRB No. 36, 70 LRRM 1153 (1969). This would apparently be the case despite the fact that an SIU employer, for example, might set up a new subsidiary or affiliate to own the vessel, so long as the ship was in fact to be operated under common direction with the rest of the fleet.

Commerce, in apparent ignorance of this fleetwide representation rule, determined to sell both its vessels, without anticipation of labor jurisdictional problems which could thereby be created.[3] Fortuitously, the sale of the first vessel was to an NMU company, so there was no incident. However, the second contract of sale, dated December 23, 1970, provided that the "Barbara" be sold to Vantage

---

1. The relevant clauses provide as follows:

"(a) The Company agrees with respect to any vessel which is presently under or may hereafter come under this Agreement, that if during the term of this Agreement said vessel is sold or transferred in any manner to any other business entity not covered by this Agreement for operation under United States flag (but not including a vessel which the Company bareboat charters and the charter is terminated), said vessel shall be sold or transferred with the complement of employees who either are or shall be provided by the Union in accordance with the terms of this Agreement, or such number as may be agreed upon between the Union and the transferee. The term 'transfer' shall be construed to include any chartering of a vessel by the Company.

"(b) The Company obligates itself to obtain for the benefit of the Union a written undertaking with the Union to be executed by the business entity to which the vessel has been sold or transferred that for the full term of the Agreement all of its terms and provisions shall apply to said vessel except as hereinabove provided and that said business entity will fully comply with all of the terms and provisions of this Agreement and any amendments thereto to preserve the jobs and job rights of the Unlicensed Personnel covered by this Agreement and to protect and maintain the wages, pension rights and other economic benefits and working conditions provided such personnel under this Agreement.

"(c) The Company agrees that if it desires to sell, bareboat charter or in any manner whatsoever transfer a vessel to another business entity, whether for United States flag or Foreign-flag registry, timely written notice to the Union must first be given prior to any such sale or transfer.

"(d) This Section shall be deemed of the essence of the Collective Bargaining Agreement and in the event of any violation, the no-strike provision of this Agreement shall not be applicable."

2. While the NLRB sanctioned the fleet-wide rule as a general proposition in that and subsequent cases, on the particular facts of the *Moore-McCormack Lines* case it permitted an exception to the rule by in effect recognizing the existence of two separate fleets belonging to the same employer, one situate on the Pacific coast, and the other on the Atlantic and Gulf coasts.

3. Vernitron, a self-styled "mini-conglomerate," had at that time recently acquired the stock of Commerce, and had had no previous maritime experience before the takeover. Its reason for selling the ships was necessity to raise cash to retire short-term indebtedness, rather than any problem arising from the operation of the vessels. Since the management of Commerce, who were experienced in maritime affairs, were themselves negotiating for purchase of at least one vessel, at the actual sale negotiations with Vantage and others, Commerce was represented by Vernitron personnel. (Cohen, Tr. pp. 68, 80–81.)

Steamship Corporation ("Vantage") for $2,750,000, with delivery set for February 28, 1971. Vantage recognizes SIU as exclusive bargaining agent for seamen on all the vessels of the "Vantage group" fleet. (Corletta, Transcript of hearing held before the undersigned on June 4, 1971 ["Transcript"], pp. 32–34.)

Predictable problems then arose. NMU, interested in preservation of the job security and pensions of its members in an industry where changing technology and rising levels of automation have caused a diminution of employment opportunities with consequent strains on the NMU pension plan (Spector, Tr. pp. 100–106), refused to waive its rights. It did attempt to secure a purchaser for the "Barbara" who was under contract with NMU, to whom Vantage could have assigned its contract, but these efforts proved unsuccessful.

Vantage, for it part, was apprehensive, with reason, of difficulties with SIU, so it refused to give any undertaking to protect NMU jurisdiction over the berths aboard the Barbara after she should become a Vantage ship. Since an attractive charter for the vessel had already been arranged, Vantage also refused to rescind the contract of sale. (Corletta, Tr. pp. 45–57, and exhibits cited therein.)[4]

Commerce was therefore faced with a dilemma: it would be held in breach of one contract (with NMU) or another (with Vantage) whether it proceeded with the sale or not.

But the choice was not left up to Commerce. On January 25, 1971, NMU instituted arbitration proceedings which resulted on February 8, 1971, in an award in its favor and against Commerce. The permanent arbitrator found that the sales contract by Commerce was a violation of its agreement with NMU because the assurances of Vantage, as required by the

NMU contract, were not (and in fact could not) be obtained. The arbitrator refrained from consideration of the validity of the contractual provisions relied upon.

On February 9, 1971, NMU commenced an action against Commerce to enforce the award by an injunction of this Court. On notice to Commerce, Hon. Inzer B. Wyatt of this Court temporarily restrained the transfer. Subsequently, on Friday, February 19, 1971, Judge Wyatt filed an opinion allowing the intervention of Vantage as a defendant, and granting its application for the dissolution of the restraining order, upon compliance with certain conditions therein enumerated. An order to that effect was entered on Monday, February 22, 1971.

However, on February 23, 1971, before performance of the required conditions had been completed, NMU's motion for a preliminary injunction was argued to Hon. Marvin E. Frankel. Judge Frankel, having been apprised of the impending February 28 transfer date, "revived" the temporary restraint by orders of February 24 and 25. Subsequently, by an opinion dated March 2, 1971, and subsequent order, Judge Frankel granted a preliminary injunction against the transfer or any transfer in violation of the agreement with NMU. An appeal by Commerce and Vantage is presently pending from that decision, the order entered in connection therewith, and the denial of an application to resettle that order.

When Vantage sought and obtained permission from Judge Wyatt to intervene in NMU's action then pending before him, it also filed a charge with the NLRB, on February 16, 1971, alleging that NMU and Commerce were engaging in an "unfair labor practice" within the meaning of Section 8(e) of the National Labor Relations Act ("the Act"), 29 U.S.C. § 158(e). The Acting Regional Di-

---

4. Subsequent events, such as the expiration of the cancellation date in the charter party, might have influenced Vantage to change its position in this respect. See Corletta, Tr. p. 47, Cohen, Tr. p. 69. This comment is obviously without prej-

udice to an independent determination of the facts in the pending arbitration proceedings, noted *infra*, or any possible subsequent legal actions arising out of them.

rector for the Second Region of the NLRB, to whom this charge was referred, eventually determined that reasonable cause existed to believe that an unfair labor practice was in fact occurring, and that the effectuation of the public policy expressed in the Act required the injunctive protection of this court. Accordingly, under the procedure mandated by 29 U.S.C. § 160(l), this court was petitioned on May 24, 1971 to grant appropriate relief against NMU pending the final adjudication of the matter by the NLRB itself. An amended petition filed in court on June 1, 1971 added Commerce as a second respondent. The motions for a preliminary injunction by NLRB, and to vacate Judge Frankel's preliminary injunction, by Commerce (without opposition from Vantage), came on before the undersigned on June 2, 1971. A hearing was scheduled and held on June 4, 1971

To complete the procedural picture, the court was advised at the hearing that the arbitration clause in the contract for the sale of the "Barbara" has now been invoked, and accordingly, Commerce and Vantage are in the process of arbitrating their claims against each other. (Corletta, Tr. p. 58.)

In summary, it can be seen that there are three coincident but separate disputes continuing among the parties. These are:

(1) Arbitration and now litigation by NMU to enforce its contractual rights with Commerce ("NMU v. Commerce and Vantage").

(2) Proceedings before the NLRB, Vantage being the charging party ("NLRB 'for Vantage' v. NMU and Commerce").

(3) Proceedings to determine Vantage's rights vis-a-vis Commerce ("Vantage v. Commerce").

Before the present motions, each of the above matters had proceeded independently of the others. The undersigned is the first judge either to have heard testimony or to have had two of the three disputes *sub judice* at one time. However, it is still premature for an omnibus determination of all parties' rights as presented by all three disputes. While "clearing the air" may simplify the determination of Vantage's rights against Commerce, that matter is not now before this or any court. The only items before this court, which will now be considered, are, first, the NLRB motion, and second, the petition to vacate the preliminary injunction.

## II

### THE NLRB MOTION

Initially, the nature of the charge against NMU should be explained. NMU has been charged with violation of Section 8(e) of the National Labor Relations Act, 29 U.S.C. 158(e).[5] Section 8(e) is designed to reinforce the secondary boy-

---

5. Section 8(e) reads as follows:
    "(e) It shall be an unfair labor practice for any labor organization and any employer to enter into any contract or agreement, express or implied, whereby such employer ceases or refrains or agrees to cease or refrain from handling, using, selling, transporting or otherwise dealing in any of the products of any other employer, or to cease doing business with any other person, and any contract or agreement entered into heretofore or hereafter containing such an agreement shall be to such extent unenforcible and void: * * *."
    Section 8(b) (4) provides that it shall be an unfair labor practice for a union:
    "(i) to engage in, or to induce or encourage any individual employed by any

person engaged in commerce or in an industry affecting commerce to engage in, a strike or a refusal in the course of his employment to use, manufacture, process, transport, or otherwise handle or work on any goods, articles, materials, or commodities or to perform any services; or (ii) to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where in either case an object thereof is:
    *      *      *      *      *
    "(B) forcing or requiring any person to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor or manufacturer, or to cease doing business with any other person * * *

cott provisions of Sections 8(b)(4). It restricts, *inter alia*, entry into so-called "hot cargo" agreements—agreements requiring the signatory employer to refrain from doing business with or handling the goods of a neutral, "secondary" employer.

■ However, a gloss on the statute has added the requirement that no injunction should issue unless it has been established that the union's purpose in bargaining for the agreement or in acting to enforce it was to satisfy objectives other than preservation of the work or work standards of the union members in the bargaining unit. Work preservation itself must always be regarded as a "primary," lawful objective. National Woodwork Manufacturers v. NLRB, 386 U.S. 612, 644–645, 87 S.Ct. 1250, 18 L.Ed.2d 357 (1967); *See* concurring opinion of Judge Leonard P. Moore, NLRB v. Local Union No. 28, Sheet Metal Workers, 380 F.2d 827 at 831 (2d Cir. 1967).

■ Whatever the tendency may be in the cases to categorize contractual terms, it is the reasonable intent of the parties, not the language chosen, which is determinative.

"To conclude that a contract term falling within the letter of § 8(e) properly falls within its prohibition, there must be either a finding that both parties understood and acquiesced in a secondary object for the term, or a finding that secondary consequences within § 8(e)'s intendment would probably flow from the clause, in view of the economic history and circumstances of the industry, the locality, and the parties." [footnotes omitted] Meat and Highway Drivers, etc. v. NLRB, 118 U.S.App. D.C. 287, 335 F.2d 709, 716 (1964).

■ It should be noted in this regard that more than six months have passed since the signing of the NMU-Commerce collective bargaining agreement. If any unfair labor practice is to be found, it must be in the economic action taken or threatened to maintain and enforce the terms of that agreement in the particular circumstances of this case, rather than in the mere signing of it. 29 U.S.C. § 160 (b); NLRB v. Local Union No. 28, Sheet Metal Workers, 380 F.2d 827, 829–830 (2d Cir. 1967). The intent of NMU therefore becomes particularly important.

An analogy may be drawn between the present case, which involves transfer of facilities from one employer to another, and cases involving subcontracting of part of one employer's work by another; the subcontracting situation being more common, has precipitated more case law.

■ The cases hold that provisions in collective bargaining agreements which limit subcontracting to employers whose employees recognized or were signatory to contracts with the primary contractor's union are unlawful "signatory" agreements. However, provisions which prohibit all subcontracting, or which require maintenance of the same work standards by the subcontractor as had been agreed upon by the primary employer are valid attempts to preserve jobs and working conditions of employees already in the bargaining unit, and are upheld as "unit preservative." Kennedy For and on Behalf of NLRB v. Sheet Metal Workers Local 108, 289 F.Supp. 65 (C.D.Calif.1968); Kaynard For and on Behalf of NLRB v. Local 282, Intl. Bro. of Teamsters, etc., 275 F.Supp. 19 (E.D. N.Y.1967); *See* Local 1976, United Bro. of Carpenters, etc. v. NLRB ("Sand Door"), 357 U.S. 93, 78 S.Ct. 1011, 2 L. Ed.2d 1186 (1958) (Before enactment of § 8(e)).

■■ Turning to the particular facts, the court concludes that on this record the motivation of the NMU in negotiating and enforcing the collective bargaining agreement with Commerce, and with the other tanker operators as well, was to preserve as many of the declining number of jobs as possible for NMU seamen. Its paramount desire was the traditional and valid one of protection of the "job pool" and the pension plan and

---

Provided, that nothing contained in this clause (B) shall be construed to make

unlawful, where not otherwise unlawful, any primary strike * * *."

other elements of job security of its members in the face of increasing automation. It does not appear to have had the objective of supplanting SIU in whole or part as bargaining agent .with Vantage. Nor was there any other dispute between NMU and Vantage upon which motivation for secondary activities ·could be predicated.[6]

But this does not resolve the issues presented. It must still be determined whether the NMU was seeking to protect work at least fairly claimable by members in the particular bargaining unit affected by the proposed sale of the "Barbara," or whether the work of union members outside the relevant bargaining unit was also sought to be protected. If the latter be the case, the activities were still secondary as being " 'work acquisition' not 'work preservation,' " directed against secondary employers. Meat and Highway Drivers, etc. v. NLRB, 118 U.S.App.D.C. 287, 335 F.2d 709, 713 (1964). The question, then, concerns the size of the bargaining unit; whether all NMU employers were included, or only the Commerce "fleet."

■ The testimony on this issue showed that the actual negotiations leading up to what was a uniform contract were held between NMU and, essentially, the Tankers Service Committee, a voluntary association of tanker companies organized for the purpose of collective bargaining. The Committee was formed and the negotiations conducted as they were in order to reduce the confusion attendant upon labor negotiations in this industry. The Committee represents about half of the operating companies with which NMU has agreements, but does not have power to bind any of its members. Dry cargo ship operators' negotiations are separately conducted.

All tanker operators were individually invited to attend the negotiating sessions; most of the smaller independents, including Commerce, did not bother. Rather, they later signed the .agreement therein negotiated, which the NMU presented to all companies on a "take it or leave it" basis. (See Spector, Tr. pp. 95–100.)

It will be seen, therefore, that the negotiations, as opposed to the actual contract signatures, were on .an industry-wide basis. On the other hand, each fleet was separately contracted for. And, of course, each ship was operated by management as a discreet "work unit." See Intl. Union, United Mine Workers, etc. v. NLRB, 130 U.S.App.D.C. 244, 399 F.2d 977, 979–980 (1968). The "bargaining unit," as opposed to the various other units, appears to be that segment of the tanker industry which recognizes NMU.

■ This determination is, of course, a preliminary one. Final decision of the appropriateness of a multi-employer bargaining unit is an issue "of fact and policy reserved for the Board [the NLRB]," Lewis v. NLRB, 122 U.S.App. D.C. 18, 350 F.2d 801, 803 (1965); 29 U.S.C. § 159(b).[6a] However, some

---

6. *But see* Cohen, Tr. p. 72. Since the undersigned is in agreement with Judge Frankel in so far as evaluation of NMU motivation is concerned, issues of *stare decisis* do not arise. See *infra.* The nature of the present motions are such that collateral estoppel is clearly not present.

6a. The following excerpt from the Sixteenth Annual Report of the NLRB, quoted in Cox & Bok, Labor Law, Seventh Edition (1969), at 336–337, summarizes the applicable criteria:

"Generally, the Board will find that such a unit is appropriate if there is a *controlling* bargaining history on a multi-employer basis. For this purpose, neither the lack of a formal association of employers nor the fact that the results of joint negotiations have been incorporated in separate uniform contracts is determinative.

"The inclusion of employees in a multi-employer unit depends primarily on whether the employer intends to be bound, or is in fact bound, by joint negotiations. Thus, in one case during the past year, The Board said 'It is the participation for a substantial period of time in joint bargaining negotiations and the uniform adoption of the agreements resulting from such negotiations that indicates a desire on the part of the participants to be

elaboration of reasoning underlying this determination is desirable.

The explanation for this finding is to be found in the nature of the industry, as viewed by the union, rather than in the nature of the formalities of contract signature. All hiring is done through a central hiring hall. Job opportunities and job security for all NMU seamen depend directly upon the number of berths filled through the NMU halls. To view one vessel or one fleet as an appropriate unit for bargaining purposes, from the NMU viewpoint, would be to acquiesce in a dangerous fiction. For it is absolutely essential to the union, in order to implement the pension plan and the seniority system, that all berths on NMU vessels be fungible. Pensions and seniority, important elements of the collective bargaining agreement, were clearly arrived at after industry-wide consultations. It was because an industry-wide agreement on pensions and seniority was essential that the NMU made the efforts it did to obtain the presence of all employers or their representatives at the negotiations. The fact that Commerce and some others took "free rides" on the efforts of the Tanker Service Committee does not mean that they separately negotiated their contracts in any real sense.

The conclusion must therefore be that, under the applicable standards as established by the NLRB, a multi-employer bargaining unit is appropriate in the present circumstances, leaving final decision on this issue to the NLRB itself. Accordingly, under the procedural standards, *see* Kennedy, *supra,* 289 F.Supp. at 84, et seq., the burden of proof upon the Regional Director has not been met. A preliminary injunction would be unwarranted, on the present facts, and might cause greater hardship than it would cure.

### III

■ One other issue remains for decision. At the present time the tanker "Barbara" lies idle, becalmed, at the eye of a large legal storm, so to speak. It might well be years before final adjudication is had of all issues now raised. Cognizant of this possibility, Commerce has moved to vacate the pre-

bound by joint, rather than individual, action and warrants the establishment of the multiemployer unit.'

"Since the employer's participation in joint negotiations is the determining factor, it is not necessary that he agree in advance to be bound by any contract which may be jointly negotiated. Conversely, the mere adoption by an employer of contracts negotiated by an employer group will not be held to require the inclusion of his employees in the multi-employer unit.

"However, an employer's intention to be bound by the joint negotiations of an association is not sufficient where the employer is not a member of the association and the association will act as bargaining agent only for its members. A history of multiemployer bargaining, nevertheless, is not necessarily controlling. Thus, where negotiations with a multiemployer committee resulted in contracts which were applicable only to members of the contracting union, a panel majority of the Board said

" 'Although the Board has sometimes accepted a member's only contract as indicative of the feasibility of the scope of the unit, traditionally the Board has refused to give controlling weight to such a bargaining history, for such history does not afford the kind of representation nor establish such a bargaining unit as the Act contemplates. In particular, it has been our policy not to permit such history to preclude the establishment of a unit such as the one involved herein, which is inherently appropriate. [Footnotes omitted.]'

"Moreover, a multiemployer bargaining history will not be held to require inclusion of employees in the multiemployer unit if their employer has effectively abandoned joint bargaining. Thus, where one member of an employer group in the course of negotiations stated that it would not join in any further group bargaining, and thereafter did not enter into any written contracts with the union involved, the Board applied the rule that 'if an employer at an appropriate time, manifests an unequivocal intent to pursue an individual course in his labor relations, a unit limited to his employees alone becomes appropriate.' " [Footnotes omitted.]

liminary injunction previously issued by Judge Frankel, on the ground of changed circumstances. NMU, but not Vantage, opposes this relief.

However, the exercise of sound discretion requires that this court refuse to entertain new evidence of changed conditions in view of the pendency of an appeal from this injunction. The proper procedure would appear to be to seek leave of the Court of Appeals to present the evidence and argument concerning alleged changed conditions in this Court. Ideal Toy Corp. v. Sayco Doll Corp., 302 F.2d 623, 625 (2d Cir. 1962). Accordingly, the motion is denied, without any opinion expressed as to the merits of the motion.

So ordered.