457 F.2d 1127
 79 L.R.R.M. (BNA) 2954, 67 Lab.Cas. P 12,543
 NATIONAL MARITIME UNION OF AMERICA, AFL-CIO, Plaintiff-Appellee,
v.
COMMERCE TANKERS CORPORATION, Defendant-Appellant,
v.
VANTAGE STEAMSHIP CORP., Intervening Defendant.
Ivan C. McLEOD, Regional Director of the Second Region of
the National Labor Relations Board, for and on
Behalf of the NATIONAL LABOR RELATIONS
BOARD, Petitioner-Appellant,
v.
NATIONAL MARITIME UNION OF AMERICA, AFL-CIO, Commerce
Tankers Corporation, Respondents-Appellees.
 Nos. 225, 226, Dockets 71-1460, 71-1831.
 United States Court of Appeals,
Second Circuit.
 Argued Oct. 7, 1971.
Decided March 22, 1972.
 
 Charles Sovel, Abraham E. Freedman, New York City, for National Maritime Union.
 Charles H. Miller, Naomi L. Reice, Don D. Buchwald, Marshall, Bratter, Greene, Allison & Tucker, New York City, for Commerce Tankers Corp.
 Douglas S. Liebhafsky, Wachtell, Lipton, Rosen & Katz; Surrey, Karasik, Greene & Seham, Hill, Betts & Nash, New York City, for Vantage Steamship Corp.
 Marvin Roth, Atty., Peter G. Nash, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Julius G. Serot, Asst. Gen. Counsel, for National Labor Relations Board.
 Before WATERMAN and SMITH, Circuit Judges, and ZAMPANO, District Judge.*
 WATERMAN, Circuit Judge:
 
 
 1
 This is a consolidated appeal from two injunction orders handed down in the United States District Court for the Southern District of New York. In chronological order, the first is an appeal (Docket No. 71-1460) by Commerce Tankers Corporation (Commerce) and Vantage Steamship Corporation (Vantage) from a preliminary injunction granted in a decision filed on March 2, 1971 (opinion reported at 325 F.Supp. 360) and an order entered on March 4, 1971 by Judge Frankel which confirmed an arbitration award in favor of the National Maritime Union (NMU). The second appeal (Docket No. 71-1831) is by Ivan C. McLeod, Regional Director of the Second Region of the National Labor Relations Board, from a lower court refusal to grant a temporary injunction pursuant to Section 10(l) of the National Labor Relations Act (29 U.S.C. Sec. 160(l)) which had been sought by the Acting Regional Director in May 1971. Judge Croake ruled as of July 15, 1971 in that action (opinion reported at 329 F.Supp. 151 (SDNY 1971)) that the Regional Director did not have reasonable cause to believe that NMU and Commerce had violated Section 8(e) of the Act (29 U.S.C. Sec. 158(e)).[1]
 
 
 2
 We reverse and remand with instructions in both of the appeals. In conformity with the following opinion we order that the district court vacate the injunction issued in Docket No. 71-1460; and we order that, inasmuch as we hold that the Regional Director did have reasonable cause to believe that NMU and Commerce had violated Section 8(e), a just and proper injunction be issued in Docket No. 71-1831.
 
 
 3
 The facts involved in this most complicated combination of appeals have been amply and adequately developed in the decisions below. The following summary of those facts will suffice for the purpose of this appeal. In July 1969, NMU and Commerce entered into a collective bargaining agreement covering all unlicensed personnel employed by Commerce on its vessels. That agreement contained the customary NMU clause requiring Commerce to recognize NMU as the sole bargaining agent for all unlicensed seamen aboard all the ships that Commerce then owned or that Commerce might thereafter acquire during the life of the agreement. There was also a provision, set forth in the margin,[2] which provided that, in the event that Commerce should sell either of its two vessels while the bargaining agreement was in force, Commerce would give NMU timely written notice thereof prior to the sale, and would obtain for the benefit of the NMU an undertaking by the transferee of the vessel that the transferee would recognize NMU as the sole bargaining agent for the ship's complement of unlicensed seamen and would accept the terms and conditions of the collective bargaining agreement with respect to those seamen.
 
 
 4
 Late in 1970 Vernitron, Commerce's parent company, determined to sell Commerce's two vessels, the Barbara and the Thalia. Without requiring the aforementioned undertaking from its transferee, Commerce attempted in December to sell the tanker Barbara to Vantage, a company which recognizes the Seafarers International Union (SIU) as its exclusive certified collective bargaining agent for all unlicensed seamen on all of the "Vantage group" fleet. That attempt has been followed by an enormous amount of activity by the lawyers for the two rival unions, for the two contracting companies, and for the National Labor Relations Board. That activity is in marked contrast to the inactivity of the subject of the contract, the tanker Barbara, which sits idly in a shipyard in Mobile for the lack of unlicensed seamen to man her.
 
 
 5
 In view of the underlying commitments affecting the situation Commerce might well have expected events to develop as they did, for there is an intense rivalry between the two major unions representing unlicensed seamen on American flag vessels: NMU and SIU. That rivalry is so acute that it provoked a remark by NMU Secretary-Treasurer Wall to Vernitron's counsel to the effect that he would rather that the Commerce ships "be lost foreign than be lost to the rival union SIU."[3] Judge Croake, at 329 F.Supp. 154, outlined the practice that fleet owners had been following:
 
 
 6
 To preserve some labor-management stability in the maritime industry, the practice has evolved and has been sanctioned that collective bargaining agreements should usually cover the crew members of all vessels in a fleet owned by a single employer and its related companies. Moore-McCormack Lines, Inc., 139 NLRB 769 (No. 70), 51 LRRM 1361 (1962). A corollary of this principle is that newly-acquired vessels are generally considered as "accretions" to a fleet, with union representation of the crew passing to the union representing the newly augmented fleet. National Maritime Union of America [NMU] (Overseas Carrier Corp.), 174 NLRB No. 36, [p. 216] 70 LRRM 1153. (footnote omitted)
 
 
 7
 Additionally, as demonstrated in the provisions of the Commerce agreement, NMU has introduced its clause which requires that, under threat of strike, signatories to its collective bargaining agreement must obtain an undertaking by any transferee of any of its vessels that the transferee recognize NMU as the bargaining agent for the unlicensed seamen aboard the ship after the transfer.
 
 
 8
 The contract to sell the Barbara was signed on December 23, 1970 with ownership to be transferred on or before March 31, 1971. Ownership has not yet been transferred, for NMU learned in January 1971 of the contract to sell and took immediate steps to see that Article I, Section 2 of its collective bargaining agreement was complied with. Negotiations between the union and the two companies were unsuccessful and NMU initiated arbitration proceedings. On February 8, 1971 the arbitrator entered an award in favor of NMU without passing on the legality of the clause in question. The award restrained the transfer of the Barbara except pursuant to the provision in the collective bargaining agreement. After an initial skirmish before Judge Wyatt,[4] NMU sought and obtained confirmation of that award in the form of a preliminary injunction issued by Judge Frankel.
 
 
 9
 In the meantime, on February 11, Vantage filed a charge with the National Labor Relations Board that the transfer clause which NMU was seeking to enforce was a "hot cargo" agreement in violation of Section 8(e) of the National Labor Relations Act (29 U.S.C. Sec. 158 (e)). Acting upon these charges, the Regional Director of the NLRB determined that there was "reasonable cause to believe" that Commerce and NMU by agreeing to the clause had engaged in and were engaging in an unfair labor practice and he petitioned the district court for a temporary injunction against the enforcement and maintenance of the transfer clause pending final disposition of the charge before the Board. After an evidentiary hearing upon this petition before Judge Croake on June 4, the court determined, McLeod v. NMU and Commerce Tankers, 329 F.Supp. 151 (1971), that the Regional Director did not have reasonable cause to believe that the clause violated Section 8(e) and the injunctive relief the petition had sought was denied.[5] The Regional Director's appeal from that denial has been consolidated with the appeal by Commerce and Vantage from Judge Frankel's order.[6] As our disposition of the appeal from the preliminary injunction granted by Judge Frankel turns to some extent on our disposition of the Regional Director's appeal, the latter is discussed and considered first.
 
 The Appeal in Docket No. 71-1831
 
 10
 The McLeod v. National Maritime Union Appeal.
 
 
 11
 As has been pointed out above, the charges filed by Vantage with the Board alleged that the transfer agreement between Commerce and NMU was an unfair labor practice within the meaning of 29 U.S.C. Sec. 158(e) and therefore unenforceable. That section reads in relevant part:
 
 
 12
 (e) It shall be an unfair labor practice for any labor organization and any employer to enter into any contract or agreement, express or implied, whereby such employer ceases or refrains or agrees to cease or refrain from handling, using, selling, transporting or otherwise dealing in any of the products of any other employer, or to cease doing business with any other person, and any contract or agreement entered into heretofore or hereafter containing such an agreement shall be to such extent unenforcible and void:
 
 
 13
 ____
 
 
 14
 * * *
 
 
 15
 The purposes and scope of this section have been fully explored in numerous cases. See, i.e., National Woodwork Manufacturers Ass'n v. N. L. R. B., 386 U.S. 612, 87 S.Ct. 1250, 18 L.Ed.2d 357 (1967); Meat and Highway Drivers, Dockmen, etc. v. N. L. R. B., 118 U.S. App.D.C. 287, 335 F.2d 709 (1964). It was intended through its enactment to close certain loopholes in 29 U.S.C. Sec. 158 (b) (4) (A) which was the predecessor to the present 29 U.S.C. Sec. 158(b) (4) (B).[7] As stated by the Supreme Court in Local 1976, United Brotherhood of Carpenters, etc., v. N. L. R. B., 357 U.S. 93, 78 S.Ct. 1011, 2 L.Ed.2d 1186 (1958), its purpose was
 
 
 16
 *****
 
 
 17
 * * *
 
 
 18
 *****
 
 
 19
 * * *
 
 
 20
 . . . to restrict the area of industrial conflict insofar as this could be achieved by prohibiting the most obvious, widespread, and, as Congress evidently judged, dangerous practice of unions to widen that conflict: the coercion of neutral employers, themselves not concerned with a primary labor dispute, through the inducement of their employees to engage in strikes or concerted refusals to handle goods. Id. at 100, 78 S.Ct. at 1016.
 
 
 21
 In that decision, however, the Court took the position that the execution of a contract not to handle non-union material and the subsequent voluntary observance of the contract's terms were not unlawful under then Section 8(b) (4) (A), now Section 8(b) (4) (B). In 1959 Congress responded to that decision by enacting Section 8(e) so that a "hot cargo" clause in a collective bargaining agreement is itself illegal;[8] and see National Woodwork, supra at 634 of 386 U.S., 87 S.Ct. 1250. For that reason the construction and interpretation of Section 8(e) has closely paralleled those of Section 8(b) (4) (B). In light of this history the Regional Director of the National Labor Relations Board determined that there was reasonable cause to believe that the NMU transfer agreement was in violation of Section 8(e) and, as we have stated supra, petitioned the court below for a temporary injunction pursuant to Section 10(l) of the Act (29 U.S.C. Sec. 160(l)) to preserve the status quo pending final determination of the unfair labor practice charge before the Board.
 
 
 22
 We begin our review of the lower court's disposition of the Regional Director's petition by observing, as did Judge Croake, that the role of the district court in a 10(l) case is not to determine whether there has in fact been a violation of the Act but rather to determine whether the Regional Director could have reasonable cause to believe that the unfair labor practice charged had been committed and that its continuation ought to be enjoined. Douds v. Milk Drivers and Dairy Employees Union, 248 F.2d 534 (2 Cir. 1957); Kennedy for and on Behalf of N. L. R. B. v. Sheet Metal Workers Int. Ass'n Local 108, 289 F.Supp. 65 (D.C.C.D.Cal.1968). We have interpreted that requirement to mean that there must be a "reasonable possibility" that the unfair labor practice charge will be sustained by the Board. McLeod for and on Behalf of N. L. R. B. v. Business Machine & Office Appliance Mechanics Conf. Bd., 300 F.2d 237 (2 Cir. 1962). While the responsibility of the district court is well defined, our own role upon appeal is less clear. Were this an appeal from the grant after an evidentiary hearing of a Sec. 10(l) injunction our scope of inquiry could be limited by the "clearly erroneous" test. However, when the appeal is from the denial of a petition for a Sec. 10(l) injunction, it seems that, in light of the congressional policy favoring the grant of such injunctions in appropriate circumstances, our scope of review ought not to be so limited. Local No. 83 Construction, etc. Drivers Union v. Jenkins, 308 F.2d 516, 517 n. 1 (9 Cir. 1962); Brown for and on Behalf of N. L. R. B. v. Pacific Telephone and Telegraph Company, 218 F.2d 542 at 544, and concurring opinion of Judge Pope (9 Cir. 1955).
 
 
 23
 Disposition of the issue of whether the petitioning Regional Director has reasonable cause to believe that an unfair labor practice has been committed does not always turn upon whether the restraints placed upon the employer by the collective bargaining agreement come within the literal wording of Section 8(e), for the comprehensive language of the section has been tempered by a judicially created exception for "work preservation" agreements. In the court below NMU successfully contended that no unfair labor practice had been committed by it and Commerce because their agreement is a "work preservation" one. The work preservation defense to charges of Section 8(e) violations was first authoritatively defined by the Supreme Court in 1967 in National Woodwork, supra. It did so in fairly unequivocal terms at pages 644-645 of 386 U.S., at page 1268 of 87 S.Ct. To quote the Court:
 
 
 24
 The determination whether the [clause] . . . violated Sec. 8(e) . . . cannot be made without an inquiry into whether, under all the surrounding circumstances, the Union's objective was preservation of work for [the contracting employer's] employees, or whether the agreements and boycott were tactically calculated to satisfy union objectives elsewhere. Were the latter the case, Frouge, the boycotting employer, would be a neutral bystander, and the agreement or boycott would, within the intent of Congress, become secondary. There need not be an actual dispute with the boycotted employer, here the door manufacturer, for the activity to fall within this category, so long as the tactical object of the agreement and its maintenance is that employer, or benefits to other than the boycotting employees or other employees of the primary employer thus making the agreement or boycott secondary in its aim. The touchstone is whether the agreement or its maintenance is addressed to the labor relations of the contracting employer vis-a-vis his own employees. [footnotes omitted].
 
 
 25
 Since that decision another formulation of that test has been widely accepted and applied. Judge Skelly Wright phrased this formulation in the following manner:
 
 
 26
 Resolution of the difficult issue of primary versus secondary activity, as it relates to this case, involves consideration of two factors: (1) jobs fairly claimable by the bargaining unit, and (2) preservation of those jobs for the bargaining unit. If the jobs are fairly claimable by the unit, they may, without violating either Sec. 8(e) or Sec. 8 (b) (4) (A) or (B), be protected by provision for, and implementation of, no-subcontracting or union standards clauses in the bargaining agreements. Activity and agreement which directly protect fairly claimable jobs are primary under the Act. Incidental secondary effects of such activity and agreement do not render them illegal. [footnotes omitted].
 
 
 27
 Meat and Highway Drivers, Dockmen, etc., v. N. L. R. B., supra, 335 F.2d at 713; accord, Retail Clerks International Ass'n, Local Union No. 1288 v. N. L. R. B., 129 U.S.App.D.C. 92, 390 F.2d 858 (1968); cf. N. L. R. B. v. Local Union No. 141 of Sheet Metal Workers' International Ass'n, 425 F.2d 730 (6 Cir. 1970).
 
 
 28
 Judge Wright's test was used by the parties as the basis of their arguments below, and the court below framed its decision with that test in mind. Judge Croake concluded that the appropriate employer bargaining unit "appears to be that segment of the tanker industry which recognizes NMU," 329 F.Supp. at 158, and because the purpose of the clause by protecting the NMU "job pool" "was to preserve as many of the declining number of jobs as possible for NMU seamen," 329 F.Supp. 157, NMU's clause conditioning vessel transfer was not a clause proscribed by Sec. 10(e) but a "work preservation" one. The core issue on appeal, therefore, is whether the district court's determination that Commerce was one of the tanker operators within the multiemployer bargaining unit the judge discovered is a justifiable determination in the light of National Labor Relations Board rulings in this area, an area fraught with opportunity for the disruption of economic peace.
 
 
 29
 The district court explained its discovery that there was a tanker operator multiemployer bargaining unit by discovering it "in the nature of the industry, as viewed by the union, rather than in the nature of the formalities of contract signature." 329 F.Supp. at 159. Judge Croake eschewed the more traditional criterion for finding multiemployer bargaining units, and, instead, rested his determination on the fact that NMU had a central hiring hall and that provision for pension plans and seniority systems must have been arrived at after industry-wide consultations. He summarizes: "To view one vessel or one fleet as an appropriate unit for bargaining purposes, from the NMU viewpoint, would be to acquiesce in a dangerous fiction." 329 F.Supp. at 159. NMU, on this appeal, strongly urges us to adopt the same approach. We, however, are unpersuaded, for we agree with National Labor Relations Board Trial Examiner Thomas A. Ricci in his determination that "[t]he position ignores too much Board law and too many basic principles underlying the Statute as a whole, to be persuasive."[9]
 
 
 30
 It was recognized by the court below that while the actual negotiations leading to the union contract were between NMU and the Tankers Service Committee, a committee representing about half of the operating companies with which NMU had agreements, Commerce had never authorized that Committee to negotiate for it, had never been a member of that or of any other multiemployer association, and had never participated in the Committee's collective bargaining with NMU. Moreover, Commerce never in any way ratified the work of that committee.[10] The collective bargaining agreement containing Art. I, section 2, between NMU and Commerce was signed on an individual basis and the wording of the agreement reflects that fact. "As written, the contract is between 'the Company' and 'the Union. . . ."'[11] And so it would appear from these undisputed and found facts that, even if, as the NMU research director, Spector, testified, NMU presented the agreement to Commerce on a "take it or leave it" basis, NMU was dealing with Commerce alone and acquiesced in the right of Commerce to deal with the union representing its employees as an individual employer of those employees.
 
 
 31
 The factors relied upon by the court below, and by NMU on appeal, have been previously considered by the Board in analogous cases, and have been held not to be controlling where the collective bargaining history, as here, does not indicate that the employer participated as part of an employer association. In Association of Motion Picture Producers, Inc. and Its Members, 88 NLRB 521, 524 (1950) the petitioner pointed "to the fact that the Employers herein have, in the past, drawn carpenters from a common labor pool; that such carpenters are employed under similar working conditions and on occasion are rotated from one employer to another." There the Board ruled that "the factors upon which the Petitioner relies in support of its contention for an industry-wide unit are not relevant in determining the appropriateness of such a unit," and ruled that where evidence is lacking as to any history of joint collective bargaining by all the employers on an industry-wide basis, a finding that there is an industry-wide employer bargaining unit would be inappropriate. 88 NLRB at 524. Again, in Shipowners Association of the Pacific Coast, 100 NLRB 1250 (1952), NMU advanced a similar argument to the argument it makes here.[12] The Board, at 1254, followed its established position "that interchangeability of employees due to a common labor pool and similarity of working conditions are, by themselves, insufficient to justify a unit coextensive with the existence of such factors." In contradistinction, the collective bargaining history of the industry is relevant.
 
 
 32
 Indeed, the law laid down by the Board as to whether an employer is within a multiemployer bargaining unit seems to require from an analysis of the pertinent facts a diametrically opposite result from that reached by the district court. We find the holding in Raymond O. Lewis, et al., Agents UMW, 148 NLRB 249, 254 (1964) extremely persuasive:
 
 
 33
 An essential element for establishing a multiemployer unit is the participation by a group of employees [sic, employers], whether members or nonmembers of a single association, either personally or through an authorized representative, in joint bargaining negotiations unequivocally manifesting the intent to be bound by group, rather than by individual, action. The facts stipulated herein fall far short of furnishing the necessary basis for finding the multisignatory unit urged upon us by UMW. The fact that the various Signatory Associations and individual Signatory Operators, since 1950, have signed identical, though separately negotiated, contracts is an insufficient basis for concluding that an industrywide contract unit has been created by the parties here, as there is an absence of evidence to indicate that the various Signatory Associations negotiated on other than an individual Association basis. Accordingly, we find, under the normal tests applied by the Board in making bargaining-unit determinations, that an industrywide unit has not been established by the parties. [footnotes omitted].
 
 
 34
 And in 1969 the Board in Moveable Partitions, Inc., 175 NLRB 915 (1969) stated:
 
 
 35
 At no time did the Employer join the Master Painters Association. At no time did it participate in negotiations or authorize the Master Painters to negotiate on its behalf. Under these circumstances, we find that this Employer has no history of bargaining in a multiemployer unit. While it has adopted contracts negotiated by the Master Painters Association, this alone is not a sufficient basis for including it in a multiemployer unit. We therefore find that the bargaining history establishes that the Employer's employees petitioned for constitute a separate appropriate unit. Id. at 916. [footnotes omitted].
 
 
 36
 see also Texas Cartage Co., 122 NLRB 999, 1000 (1959); cf. Chester County Beer Distributors Association, 133 NLRB 771 (1961).[13]
 
 
 37
 We agree with Trial Examiner Ricci that basic to those decisions is the Board's belief that "Every employer has a right to bargain with respect to its employees and only its employees . . .,"[14] unless he manifests an intent to the contrary. Indeed, as stated by the Examiner, the Statute speaks first and foremost of the "employer" unit as appropriate. But we recognize, of course, that the process of collective bargaining is conducted by employees as well as by employers and that we should look not only to the intent of the employer while bargaining, but also to whether here the union in dealing with Commerce had treated with it as an employer member of a group unit. See NLRB v. Bagel Bakers Council of Greater New York, 434 F.2d 884, 886 (2 Cir. 1970). It is undisputed, as we have pointed out above, that NMU dealt directly with Commerce and acquiesced when Commerce chose to sign the agreement NMU submitted to it as an individual employer bargaining as such.
 
 
 38
 Thus it appears that any bargaining unit for whom the union could justifiably preserve work would be composed solely of Commerce's employees and could not justifiably include all NMU members, wherever dispersed, who await work assignments at a central hiring hall. As it was found by the court below and was conceded by NMU on appeal that the purpose of the relevant clause in the agreement was to preserve work for all unlicensed seamen using its hiring hall and not merely for those employed by Commerce within the bargaining unit we agree with the appellant Regional Director that there is at least a reasonable possibility that the Board also will so interpret the clause. So understood, the agreement was designed to preserve work not only for the members within the bargaining unit but also was intended to acquire work for members of the union as a whole. As such it constitutes an unfair labor practice within the meaning of Section 8(e) of the Act, and the Regional Director had reasonable cause to believe that NMU's restrictive transfer clauses constitute secondary activity prohibited by that section.
 
 
 39
 Of course, we recognize, as the court below recognized, that ours is only a preliminary decision and that the final decision will be made by the National Labor Relations Board and the courts to whom the Board's decision may be appealed. No doubt when the Board makes that decision it will give careful consideration to the factors relied upon by the court below and may ultimately agree with that court's treatment of them. However, on the basis of prior Board pronouncements the Regional Director has satisfied his burden of showing "reasonable cause" to justify the issuance of a 10(l) injunction pending the Board decision.
 
 
 40
 The statute (29 U.S.C. Sec. 160(l)) requires that in 10(l) cases a twofold determination be made: First, as we have pointed out, it must be determined whether the Regional Director has reasonable cause to believe that the unfair labor charges filed with the Board are true; and, second, that the issuance of any injunction would be "just and proper" under the circumstances.
 
 
 41
 We hold that the issuance of an injunction would be just and proper here and therefore we remand for its issuance after a determination below of the extent of the relief required to preserve the status quo until adjudication of the Sec. 8(e) issue by the National Labor Relations Board.
 
 
 42
 The Appeal in NMU v. Commerce Tanker-Docket No. 71-1460
 
 
 43
 Disposition of this appeal does not require any extended discussion, for we have above indicated our approach to it.
 
 
 44
 Subsequent to the time that Judge Frankel, at the request of NMU, issued his injunction restraining Commerce from selling or transferring the Barbara unless Article I, Section 2, of their collective bargaining agreement were complied with, the Regional Director of the National Labor Relations Board brought his complaint in Docket No. 71-1831. We have above agreed with him that, pending final resolution of whether NMU and Commerce have committed unfair labor practices, any attempt by NMU to enforce the restrictions contained in the clauses of Art. I, Section 2 should be enjoined.[15]
 
 
 45
 The positions taken by the Union and the Employer at the time of their arbitration proceeding have been affected first, by the contemporaneous filing of the unfair labor practice charge with the Board by Vantage which was followed by the later commencement of the Regional Director's action in the district court; and, second, by our adjudication herein upon that action.[16] The effect of the filing of the Regional Director's complaint was recognized by Judge Croake when he first ruled upon whether this injunction should be vacated and before he decided that he should not take this changed condition into account, 329 F.Supp. at 160.
 
 
 46
 As was pointed out by Judge Croake in his June 22, 1971 decision prior to the amendment of July 15, 1971:
 
 
 47
 After March 4, when the injunction was issued, the determination of the Regional Director of NLRB that a complaint should issue against NMU and Commerce for attempted implementation of the clause (which Commerce and Vantage are presently enjoined from violating) did in fact significantly alter the parties' situation. A new "party"-the NLRB, has in effect intervened in the dispute, and has raised a new and preeminent issue: the public interest.
 
 
 48
 Moreover, (see footnote 1) we agree with Judge Croake's June 22 assessment of how the equities should be balanced, i. e., by vacating the Frankel injunction. Although he subsequently determined in the exercise of sound judicial discretion that he should not consider modifying Judge Frankel's order while this appeal was pending, his reasoning behind his original order was sound. As he stated then, while the potential for hardship to the two unions "from an erroneous determination of the propriety of maintenance of this injunction is approximately equal, . . . from the point of view of the companies, the severity of the present economic hardship being incurred because of the injunction is severe and avoidable." We believe that to allow the Barbara to remain idle in a Mobile shipyard would be a tragic waste.
 
 
 49
 The preliminary injunction issued by Judge Frankel on March 2, 1971 is ordered vacated.
 
 
 
 *
 Of the United States District Court for the District of Connecticut, sitting by designation
 
 
 [1]
 At this time there was also a motion before Judge Croake brought by Commerce to dissolve the injunction issued by Judge Frankel against it, enforcing the arbitration award. This motion was based upon the fact that Vantage had filed an unfair labor practice charge against NMU and Commerce on the ground that compliance with the terms of their bargaining contract (which Commerce was enjoined from breaking) violated the "hot cargo" provisions of Section 8(e) and that in May the Regional Director of the NLRB had followed up the matter by filing his petition in the district court
 At first, on June 22, Judge Croake filed an opinion and order granting the Commerce petition. He held that the parties' situation had changed since March and that, as the injunction was more severe on the Companies than on NMU, the equities of the changed situation favored a vacatur. After a rehearing, however, he exercised his discretion not to consider this new evidence while the preliminary injunction was on appeal and denied the motion. See 329 F.Supp. at 159-160. And see text p. 1138 infra.
 
 
 [2]
 Art. I, Section 2. Sale and Transfer of Vessels
 (a) The Company agrees with respect to any vessel which is presently under or may hereafter come under this Agreement, that if during the term of this Agreement said vessel is sold or transferred in any manner to any other business entity not covered by this Agreement for operation under United States flag (but not including a vessel which the Company bareboat charters and the charter is terminated), said vessel shall be sold or transferred with the complement of employees who either are or shall be provided by the Union in accordance with the terms of this Agreement, or such number as may be agreed upon between the Union and the transferee. The term "transfer" shall be construed to include any chartering of a vessel by the Company.
 (b) The Company obligates itself to obtain for the benefit of the Union a written undertaking with the Union to be executed by the business entity to which the vessel has been sold or transferred that for the full term of the Agreement all of its terms and provisions shall apply to said vessel except as hereinabove provided and that said business entity will fully comply with all of the terms and provisions of this Agreement and any amendments thereto to preserve the jobs and job rights of the Unlicensed Personnel covered by this Agreement and to protect and maintain the wages, pension rights and other economic benefits and working conditions provided such personnel under this Agreement.
 (c) The Company agrees that if it desires to sell, bareboat charter or in any manner whatsoever transfer a vessel to another business entity, whether for United States flag or Foreign-flag registry, timely written notice to the Union must first be given prior to any such sale or transfer.
 (d) This Section shall be deemed of the essence of the Collective Bargaining Agreement and in the event of any violation, the no-strike provision of this Agreement shall not be applicable.
 
 
 [3]
 At the June 4 hearing before Judge Croake, David Cohen, corporate counsel for Vernitron and assistant secretary of Vernitron's wholly owned subsidiary, Commerce Tankers, testified to this. He stated that he and another representative of Commerce met near the end of March 1971 with Attorney Sovel, the secretary treasurer of NMU Shannon Wall, and a Mr. Barisic. His testimony elicited by counsel for the Regional Director of the National Labor Relations Board follows:
 Q. Would you tell us then the conversation that took place between Commerce and NMU on that date? A. We were asking for special dispensation again under the clause. We pointed out to them our contractual relationship with Vantage. We stated that we intended to sell the vessel as soon as we were free to do so.
 Q. Was this upon your assumption at that time that the purchaser might exercise the option to cancel by April 4th? A. It was.
 Q. Continue, sir. A. We stated that we had been inquiring in the market and that the possibility of a domestic sale of the vessel was virtually impossible because of the deteriorating conditions; that there was one or two interested purchasers and they were foreign flag operators.
 We said that there was no reason for them to insist on this any more in our view because in either event, whether we sold to Vantage, or whether we sold to foreign flags, they would lose the jobs.
 Mr. Bennett (Counsel for the Regional Director): I would like to call to the Court's attention that the collective bargaining agreement that is under attack by us provides that sales may be made to foreign flag operators without obtaining the undertaking that NMU continue in its representative status.
 Q. Continue, Mr. Cohen. A. They were trying to ascertain whether or not they could give us this dispensation. Mr. Barisic and Mr. Wall recognized the peculiar economic circumstances of Commerce and Vernitron and they were discussing among themselves the pros and cons of granting the dispensation.
 Q. When you pointed out to the NMU that the jobs would be lost in either event, if you sold foreign or if they permitted the sale to be made to Vantage, did Mr. Wall make any comment? A. Yes, he did.
 Q. What did Mr. Wall say? A. He said they would rather be lost-
 Q. Speak up, sir. A. He said he would rather they be lost foreign than be lost to the rival union SIU. He was talking in the context of this being a principle, an important principle to the NMU which they were seeking to uphold.
 Mr. Sovel made the comment that the granting of this dispensation wouldn't look very good in the proceedings that were then pending.
 Q. There is no doubt in your mind, sir, that Mr. Wall made the statement, in words or in substance, that you have just attributed to him, that he would sooner the sale went foreign than see it go to a rival union? A. Yes, he said Mr. Nathanson and I didn't understand the intense rivalry between the SIU and NMU.
 Mr. Bennett: No further questions.
 
 
 [4]
 On February 9, NMU, on the basis of having received the arbitrator's award, sought a temporary restraining order from the district court pending application for a preliminary injunction. The ensuing history, prior to the issuance of a final preliminary injunction, appears at 325 F.Supp. 363. During these proceedings, Vantage, which had not been a party to the arbitration, intervened and became a party in the district court. Judge Wyatt was of the opinion that the transfer of the Barbara should not be prevented, and proposed that a substantial bond be put up by the companies to protect the union in the event it turned out that the transfer should have remained enjoined
 
 
 [5]
 And also determined that the injunction issued on March 4, 1971 should not be vacated. See footnote 1, supra, and text, infra, at p. 1138. Because there had been a motion to vacate the March 4 injunction, Vantage, as an intervenor in that proceeding, was before Judge Croake, as well as the union and Commerce, which latter two parties were before him both as respondents in the injunction proceeding brought by the Regional Director and as plaintiff and defendant, respectively, in the proceeding to vacate the March 4 injunction
 
 
 [6]
 After the consolidated appeal was set for argument the U.S. Maritime Administration sought leave to be heard as the government agency having the responsibility of maintaining the nation's merchant marine in the development and promotion of foreign and domestic commerce by means of water-borne transportation. It was granted leave to file a brief amicus-curiae. The administration, in a most valuable brief, supported the position of the Regional Director appellant, stating that enforcement of Art. I, Section 2, of the collective bargaining contract would be "clearly at odds with the stated National Maritime policy" contained in 46 U.S.C. Sec. 1101
 
 
 [7]
 Section 8(b) (4) (B) (29 U.S.C. Sec. 158 (b) (4) (B)) reads:
 (b) It shall be an unfair labor practice for a labor organization or its agents-
 (4) (i) to engage in, or to induce or encourage any individual employed by any person engaged in commerce or in an industry affecting commerce to engage in, a strike or a refusal in the course of his employment to use, manufacture, process, transport, or otherwise, handle or work on any goods, articles, materials, or commodities or to perform any services; or (ii) to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where in either case an object thereof is-
 (B) forcing or requiring any person to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person, or forcing or requiring any other employer to recognize or bargain with a labor organization as the representative of his employees unless such labor organization has been certified as the representative of such employees under the provisions of section 159 of this title: Provided, that nothing contained in this clause (B) shall be construed to make unlawful, where not otherwise unlawful, any primary strike or primary picketing;
 
 
 [8]
 This amendment appears in Section 704 (b) of the Labor-Management Reporting and Disclosure Act of 1959, approved Sept. 14, 1959, P.L. 86-257; 1959 Cong. & Adm.News p. 565
 
 
 [9]
 The Board's General Counsel filed an unfair labor practice complaint, based upon Vantage's charges, with the Board. Hearings were held before Thomas A. Ricci, the Board's trial examiner. See National Maritime Union of America et al. (2-CE-44). Ricci on September 2, 1971 filed his findings and his recommended order. A typewritten copy of these findings and this order were furnished us by NMU
 Ricci recommended that the complaint be dismissed, for he ruled that there had been no violation of Section 8(e). Nevertheless, following well-defined Board precedents, he determined that the relevant bargaining unit was limited to the employees of Commerce. He arrived at his result by reasoning that the employees within Commerce's single employer unit included all seamen using the NMU central hiring hall, irrespective of whether they had ever received wages from Commerce or had ever been employed by that corporation. We do not rule on the validity of this novel approach to the employer-employee relationship because the validity of this novel concept has not been briefed or argued to us. The quoted language in the above text appears on page 10 of this NMU typewritten copy.
 
 
 [10]
 Findings of Examiner Ricci at page 10
 
 
 [11]
 Findings of Examiner Ricci at page 10
 
 
 [12]
 Quoting from the Board's decision: The NMU contends that the petition should be dismissed on the ground that the only appropriate unit is an overall unit, which would include employees in the steam schooner trade as defined in the contracts covering that trade together with employees in the offshore, intercoastal, and Alaska trades (which trades are commonly referred to collectively as the offshore trade) as defined in the contracts covering those trades. Such a unit would, in effect, comprise all stewards department employees on all ships operated by the members of both the SAPC and the Pacific Maritime Association. 100 N.L.R.B. 1252, 1253
 
 
 [13]
 The holding was predicated on reasoning similar to that of the previously quoted cases. To quote the Board:
 An essential element for establishing a multi-employer unit is the participation by a group of employers, whether members or nonmembers of an association, either personally or through an authorized representative, in joint bargaining negotiations unequivocally manifesting the intent to be bound by a group, rather than by individual, action. . . . The fact that the other associations in the area signed contracts identical to those which the Union separately negotiated with the Employer is insufficient to establish a multi-association bargaining unit as the only appropriate unit. 133 N.L.R.B. 773.
 The Board cited Texas Cartage Company.
 
 
 [14]
 Findings of Examiner Ricci at page 10
 
 
 [15]
 Always provided, however, that just and proper safeguards be prescribed to protect any party in the event of final Board action adverse to the interests of that party
 
 
 [16]
 The Board has of course not yet acted upon these charges. But see, supra, our statement of the findings of the NLRB trial examiner