Thomas W. SEELER, Regional Director of the Third Region of the National Labor Relations Board, for and on behalf of the National Labor Relations Board, Petitioner-Appellant,

v.

The TRADING PORT, INC., Respondent-Appellee.

No. 439, Docket 74–2150.

United States Court of Appeals, Second Circuit.

Argued Feb. 13, 1975.

Decided May 27, 1975.

Charles I. Cohen, Supervisory Atty., N. L. R. B., Washington, D. C. (Peter G. Nash, Gen. Counsel, John S. Irving, Deputy Gen. Counsel, Gerald Brissman, Associate Gen. Counsel, Marvin Roth, Deputy Asst. Gen. Counsel, Andrew F. Tranovich, Atty., on the brief), for petitioner-appellant.

Edward L. Bookstein, Albany, N. Y. (Kohn, Bookstein & Karp, on the brief, Richard A. Kohn, Albany, N. Y., of counsel), for respondent-appellee.

Before HAYS and FEINBERG, Circuit Judges, and HOLDEN, District Judge.*

HAYS, Circuit Judge:

In this appeal we are asked to decide whether a district court upon an application for a temporary injunction under § 10(j) of the Labor Management Relations Act, 29 U.S.C. § 160(j) (1970), should order an employer, who has engaged in a series of unfair labor practices, to bargain collectively with a union of his employees after the union has lost in an election of representatives. Petitioner, acting on behalf of the National Labor Relations Board, applied to the United States District Court for the Northern District of New York for an order temporarily enjoining the defendant employer from engaging in alleged unfair labor practices under sections 8(a)(1), 8(a)(3), and 8(a)(5) of the Act, 29 U.S.C. § 158(a)(1), (3), and (5) (1970), compelling the defendant to rehire certain workers allegedly laid off in violation of the Act, and requiring the employer to recognize and bargain with Local 294 of the International Brotherhood of Teamsters. Judge Brieant granted petitioner's motion only insofar as it requested an injunction against unfair labor practices under sections 8(a)(1) and 8(a)(3).[1] He held that where no previous bargaining relationship exists and the union has lost in an election of representatives, the district courts under § 10(j) should not order collective bargaining "based merely on [authorization] cards." We reverse.

## I.

The Trading Port, Inc., situated in Albany, New York, is engaged in the wholesale and retail grocery business. Prior to the labor dispute which gave rise to these proceedings, the company employed forty-nine warehousemen. On August 29, 1973, nineteen of the employees met with representatives of Teamsters Local 294 at the union hall. All those present signed cards designating the Local as their bargaining representative. Shortly thereafter, cards were distributed to the remaining warehousemen and by September 4, forty-three had signed cards.[2] After being advised by employee James Dillenbeck that a majority had been obtained, union president Nicholas Robilotto met with Isadore Tabachneck, president of Trading Port, and offered to have a neutral third party count the cards and verify the union's majority. Tabachneck refused this offer and also refused to recognize the union. On September 8 a strike vote was held at the union hall and after company officials again refused a neutral card count, a strike began on September 9.

The strike ended on September 29 when the employees voted to return to work and to petition the Board for an election. When the strikers reported for work on October 1, as instructed, they were issued lay-off slips. Ten strikers were subsequently rehired; eleven other employees had returned to work during the strike. On November 1, the company informed approximately twenty of the strikers that they had been permanently laid off.

The NLRB election was held on December 4. Three votes were cast for the union, twenty-five votes were cast against it, and there were nineteen challenged ballots. The union filed objections to the election and a charge .of

---

* Chief Judge of the United States District Court for the District of Vermont, sitting by designation.

1. The district court enjoined the respondent from hiring anyone for positions previously held by strikers without offering reinstatement in order of seniority to those laid off after the strike. However, it refused to order the employer to reinstate all those laid off. On June 18, 1974, after the district court's decision was filed, the administrative law judge's decision ordering the reinstatement of these employees was issued. Respondent has apparently complied with that portion of the decision, and the Regional Director has therefore chosen not to appeal the district court's refusal to order reinstatement.

2. The administrative law judge found that 42 cards were valid. He found that one card was obtained through improper inducements. Cf. N.L.R.B. v. Savair Mfg. Co., 414 U.S. 270, 94 S.Ct. 495, 38 L.Ed.2d 495 (1973).

unfair labor practices under sections 8(a)(1), 8(a)(3), and 8(a)(5) against the Trading Port. The General Counsel issued a complaint, and the unfair labor practice and representational proceedings were consolidated for a hearing before an administrative law judge. On March 13, 1974, while the hearing was in progress, the Regional Director moved in the district court for a temporary injunction against the respondent.

In the proceedings before Judge Brieant, the parties stipulated that the record of the hearings before the administrative law judge was complete and no other evidence was necessary.[3] That record includes the testimony of numerous Trading Port employees claiming that among other things, the respondent 1) threatened employees with the loss of jobs and other reprisals if they selected the union or went on strike; 2) promised benefits to employees if they abandoned the union; 3) threatened to close its warehouse and to refuse to take back strikers when the strike ended; 4) coercively interrogated employees about how they would vote in the coming election; and 5) discriminated against union supporters in its rehiring practices after the strike and before the election. In its defense respondent offered testimony de-

nying that certain conversations ever took place and explaining that other remarks were made in jest. Respondent defended its hiring procedures on the ground that the strike had caused a genuine contraction of its business and that it chose to rehire based on merit and not seniority, which it claimed had never played a major role in its employment policy in the past.

## II.

■ The district courts may grant temporary injunctive relief under sections 10(j)[4] and 10(*l*)[5] of the L.M.R.A. if there is reasonable cause to believe that unfair labor practices have been committed. See, e. g., McLeod v. National Maritime Union, 457 F.2d 1127, 1138 (2d Cir. 1972); International Union, UAW v. N.L.R.B. (Ex-Cell-O Corp.), 145 U.S.App. D.C. 384, 449 F.2d 1046, 1051 (1971); Angle v. Sacks, 382 F.2d 655, 658 (10th Cir. 1967); McLeod v. Local 25, IBEW, 344 F.2d 634, 638 (2d Cir. 1965). In this case, the district court concluded that there was reasonable cause to believe that the respondent had committed unfair labor practices under sections 8(a)(1) and 8(a)(3) of the Act.[6] Although there are

---

**3.** Despite the stipulation, the court decided to take additional proof regarding the present employment status of employees who had been laid off by the respondent.

**4.** Section 10(j) of the L.M.R.A., 29 U.S.C. § 160(j) (1970) provides:

"The Board shall have power, upon issuance of a complaint . . . charging that any person has engaged in or is engaging in an unfair labor practice, to petition any United States district court, within any district wherein the unfair labor practice in question is alleged to have occurred . . . for appropriate temporary relief or restraining order. Upon the filing of any such petition the court . . . shall have jurisdiction to grant to the Board such temporary relief or restraining order as it deems just and proper."

**5.** Section 10(*l*) of the L.M.R.A., 29 U.S.C. § 160(*l*) (1970) provides that in the case of certain employee unfair labor practices, generally involving secondary boycotts and representational and jurisdictional disputes, the pre-

liminary investigation should be expedited and the regional director should seek injunctive relief even before the complaint is filed. This court has held that in deciding whether to grant injunctive relief, the district court should apply the same standards in § 10(*l*) cases as it does in § 10(j) cases. Danielson v. Joint Board of Coat, Suit, and Allied Garment Workers Union, 494 F.2d 1230, 1242 (2d Cir. 1974).

**6.** The district court did not make any specific finding on whether the employer violated § 8(a)(5) of the Act as well. The administrative law judge subsequently held that by refusing to bargain with Local 294 despite its majority and committing independent unfair labor practices, respondent did violate § 8(a)(5) and that it further violated the section by unilaterally changing working conditions in the plant after the union's demand for recognition. The administrative law judge also recommended that the Board order the respondent to bargain with Local 294. Under the Supreme Court's decision in N.L.R.B. v. Gissel Packing Co., 395 U.S. 575, 595–600, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969), the Board

disputed issues of fact in the case, the Regional Director should be given the benefit of the doubt in a proceeding for § 10(j) relief. See Danielson v. Joint Board of Coat, Suit & Allied Garment Workers Union, 494 F.2d 1230, 1245 (2d Cir. 1974). We therefore affirm the holding of the district court that it had sufficient cause to believe that unfair labor practices had been committed, to warrant granting injunctive relief under § 10(j).[7]

After finding "reasonable cause," the district court went on to consider whether the specific relief requested by the Regional Director was "just and proper," as required by the statute. The court decided that it would be proper to enjoin the respondent from engaging further in coercive or discriminatory antiunion conduct. However, Judge Brieant declined to order the respondent to recognize and bargain with Local 294. He held, basing his conclusions primarily on Fuchs v. Steel-Fab, Inc., 356 F.Supp. 385 (D.Mass. 1973) and Kaynard v. Lawrence Rigging, Inc., 68 CCH Lab. Cas. ¶ 12,735 (E.D.N. Y.1972), that when a union has never had a bargaining relationship with an employer and has failed to win an election, it is not just and proper for a district court to order bargaining, even though the Board is free to find on the

merits that the union's previous card majority coupled with subsequent unfair labor practices by the employer justify such an order. We disagree.[8]

In N.L.R.B. v. Gissel Packing Co., 395 U.S. 575, 614, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969), the Supreme Court upheld the use of bargaining orders by the Board in cases in which the union had a card majority at one point but was later confronted with employer unfair labor practices tending "to undermine majority strength and impede the election processes."[9] The Court reasoned that an order to cease and desist from future unfair labor practices would be ineffective:

"The damage will have been done, and perhaps the only fair way to effectuate employee rights is to re-establish the conditions as they existed before the employer's unlawful campaign." 395 U.S. at 612, 89 S.Ct. at 1939.

■ Just as a cease and desist order without more is ineffective as final relief in a *Gissel* situation, it is, in certain cases, also insufficient as interim relief. If an employer faced with a union demand for recognition based on a card majority may engage in an extensive campaign of serious and pervasive unfair labor practices, resulting in the union's

could find a violation of § 8(a)(5) and issue a bargaining order on those facts. However, in Steel-Fab, Inc., 212 N.L.R.B. No. 25 (1974), in which the Board, in a 3–2 decision, declined to find a § 8(a)(5) violation under similar circumstances, a bargaining order was held to be a proper remedy for § 8(a)(1) and § 8(a)(3) violations which dissipate a union's majority and disrupt the election process, as respondent's unfair labor practices allegedly did in this case.

7. The district court's conclusion is bolstered by the subsequent findings of the administrative law judge to the effect that extensive unfair labor practices had in fact been committed. See notes 1 and 6 supra.

8. We have not been directed to, nor have we found, any decision by a court of appeals concerning the issuance of a bargaining order under § 10(j) in a case such as this. Two district courts in addition to two cited by the district judge in the present case have passed on the

issue. In both cases, the courts granted applications for bargaining orders where the union had never had a bargaining relationship and had not won an N.L.R.B. election. See Smith v. Old Angus, Inc., 69 CCH Lab. Cas. ¶ 13,229 (D.Md.1972); Henderson v. Gibbons & Reed Co., 53 CCH Lab. Cas. ¶ 11,081 (D.N.M.1966).

9. The district judge noted in his opinion that the Supreme Court then had before it a case which "may affect the future of the *Gissel* rule." In Linden Lumber Division v. N.L.R.B., 419 U.S. 301, 95 S.Ct. 429, 42 L.Ed.2d 465 (1974), the Court subsequently held that it is not an unfair labor practice for an employer to refuse to bargain without an election where the union claimed a majority based on cards and the employer committed no independent unfair labor practices. However, the Court reaffirmed the *Gissel* holding that a bargaining order is proper where an employer couples his refusal to bargain with unfair labor practices disruptive of the election process. 419 U.S. at 301, 95 S.Ct. 429, 42 L.Ed.2d 465.

losing an election, and is then merely enjoined from repeating those already successful violations until final Board action is taken, the Board's adjudicatory machinery may well be rendered totally ineffective. A final Board decision ordering a new election will leave the union disadvantaged by the same unfair labor practices which caused it to lose the first election. Even if the Board finally orders bargaining, probably close to two years after the union first demanded recognition,[10] the union's position in the plant may have already deteriorated to such a degree that effective representation is no longer possible. Only if the district courts may issue interim bargaining orders can the union's viability be maintained to the degree necessary to make final Board adjudication in the form of an election or a bargaining order meaningful. As the Senate Report stated in regard to the need for § 10(j):

> "*Time is usually of the essence in these matters,* and consequently *the relatively slow procedure of Board hearing and order,* followed many months later by an enforcing decree of the circuit court of appeals, *falls short of achieving the desired objectives* —the prompt elimination of the obstructions to the free flow of commerce and encouragement of the practice and procedure of free and private collective bargaining. *Hence we have provided that the Board, acting in the public interest and not in vindication of purely private rights,* may seek injunctive relief. . . ." (emphasis added.) Senate Report No. 105, 80th Cong., 1st Sess., 8 (1947), cited in I Legislative History of the Labor Management Relations Act, 1947, 414 (1948).

### III.

■ The district court below, as well as the courts in *Steel-Fab* and *Law-*rence Rigging, believed that the use of a bargaining order under § 10(j) when the union had never had a bargaining relationship with the employer would upset rather than preserve the status quo. See Fuchs v. Steel-Fab, Inc., supra, 356 F.Supp. at 387; Kaynard v. Lawrence Rigging, Inc., supra at 24,364. We agree that the effect on the status quo is an important consideration in deciding whether equitable relief is "just and proper" under § 10(j). See Minnesota Mining and Manufacturing Co. v. Meter, 385 F.2d 265, 270 (8th Cir. 1967); McLeod v. General Electric Co., 366 F.2d 847, 850 (2d Cir. 1966), vacated on other grounds, 385 U.S. 533, 87 S.Ct. 637, 17 L.Ed.2d 588 (1967); McLeod v. Compressed Air Workers, Local No. 147, 292 F.2d 358, 361 (2d Cir. 1961). However, the status quo which deserves protection under § 10(j) is not the illegal status quo which has come into being as a result of the unfair labor practices being litigated. See Danielson v. Local 275, Laborers Int'l Union, 479 F.2d 1033, 1037 (2d Cir. 1973); Boire v. International Brotherhood of Teamsters, 479 F.2d 778, 788 (5th Cir. 1973); McLeod v. National Maritime Union, supra, 457 F.2d at 496; Greene v. Mr. Wicke Ltd., 270 F.Supp. 1012, 1016 (D.Conn.1967) (Timbers, J.). Instead, section 10(j) was intended as a means of preserving *or restoring* the status quo as it existed before the onset of unfair labor practices. See Senate Report No. 105, supra at 27; Minnesota Mining and Manufacturing Co., 385 F.2d supra at 270; McLeod v. General Electric Co., 366 F.2d supra at 850 n. 3.

■ As the Supreme Court stressed in *Gissel*, when a union loses its majority as the result of employer unfair labor practices, it is essential not to freeze the present situation, but rather to "re-establish the conditions as they existed before the employer's unlawful campaign," 395 U.S. at 612, 89 S.Ct. at 1939. Those previous conditions constitute the status quo which the courts should restore

---

**10.** Local 294 demanded recognition on September 4, 1973.

through the issuance of a bargaining order under § 10(j). See Smith v. Old Angus, Inc., 69 CCH Lab. Cas. ¶ 13,229 at 25,841 (D.Md.1972); Henderson v. Gibbons & Reed Co., 53 CCH Lab. Cas. ¶ 11,-081 at 16,361 (D.N.M.1966) (bargaining orders issued in both cases based on card majorities to restore pre-unfair labor practice status quo).

### IV.

■ Relying on McLeod v. General Electric Co., supra, respondent argues that the issuance of a bargaining order in this case would be "radical relief" not called for under § 10(j). It contends that the courts should not attempt to establish a "wholly new relationship" between the parties and to override the majority will expressed against the union in the election. The district court in *Lawrence Rigging* argued similarly that instead of preventing irreparable harm, a district court risks *causing* irreparable harm if it grants a bargaining order only to have the union later lose a proper election.

We do not agree that either *General Electric* or the irreparable harm standard, properly applied, supports ·the decision of the district court not to issue a bargaining order. In *General Electric* this court was faced with the charge that the company had violated § 8(a)(5) by refusing to bargain with the union's negotiating committee, which included seven members from outside unions. The court held that particularly since the question of whether the company was required to bargain under such conditions was an unsettled one, it would be best to leave the case for an initial decision by the Board, absent any showing of a need to preserve the status quo or prevent irreparable harm. 366 F.2d at 850. In the instant case, however, there is no doubt that the conduct with which the respondent is charged is flagrantly violative of the Act. Furthermore, while in *General Electric* there was an estab-

lished bargaining relationship between the company and the union, which the Court apparently felt could survive the period pending Board adjudication, here it is alleged that any collective bargaining has been prevented by employer unfair labor practices and that further delay may make such bargaining impossible in the future, regardless of what the Board should finally decide. Under these circumstances, the district court has the power to order immediate bargaining to prevent irreparable harm to the union's position in the plant, to the adjudicatory machinery of the NLRB, and to the policy of the Act in favor of the free selection of collective bargaining representatives. See Boire v. International Brotherhood of Teamsters, supra, 479 F.2d at 778 (relief warranted to prevent final Board decision from being useless); Minnesota Mining and Manufacturing Co. v. Meter, supra, 385 F.2d at 270 (relief warranted to prevent frustration of Act's "remedial purposes"); McLeod v. Compressed Air Workers, Local No. 147, supra, 292 F.2d at 361 (standard for injunction is protection of public interest); Angle v. Sacks, supra, 382 F.2d at 660 (relief warranted to prevent frustration of Act's purposes); Brown v. Pacific Telephone and Telegraph Co., 218 F.2d 542, 544 (9th Cir. 1954) (relief warranted by irreparable harm to union of having members drift away); Smith v. Old Angus, Inc., supra at 25,840 (bargaining order issued based on card majority to prevent irreparable dissipation of union strength).

■ Far from being radical relief, a bargaining order designed to prevent frustration of the purposes of the Act fits well within the general principles applicable to statutory injunctions. As the Supreme Court held in Hecht Co. v. Bowles, 321 U.S. 321, 329–30, 64 S.Ct. 587, 88 L.Ed. 754 (1944), legislative provisions calling for equitable relief to prevent violations of a statute require the courts to act in accordance with traditional equity practice "as conditioned by the necessities of the public interest

which Congress has sought to protect." As the Court stressed, "the standards of the public interest, not the requirements of private litigation, measure the propriety and need for injunctive relief in these cases." Id. at 331, 64 S.Ct. at 592. In line with these principles and with the legislative history of the section, see Senate Report No. 105, supra at 8, section 10(j) should be applied "in the public interest and not in vindication of purely private rights," so as to further the policies of the Act. See International Union, UAW v. N.L.R.B. (Ex-Cell-O Corp.), supra, 449 F.2d at 1051; Henderson v. International Union of Operating Engineers, Local 701, 420 F.2d 802, 808 (9th Cir. 1969); Minnesota Mining and Manufacturing Co. v. Meter, supra, 385 F.2d at 272; McLeod v. Compressed Air Workers, Local No. 147, supra, 292 F.2d at 361; Brown v. Pacific Telephone and Telegraph Co., supra, 218 F.2d at 544 (Pope, J., concurring). Cf. Danielson v. Joint Board of Coat, Suit and Allied Garment Workers Union, supra, 494 F.2d at 1240–41 (holding the criteria for equitable relief set out in *Hecht* applicable to §§ 10(j) and 10(*l*)).

## V.

In granting a bargaining order in favor of a union which has lost an election and can claim a majority only on the basis of authorization cards, the district court runs the risk that the employees, even if uncoerced, would not have chosen the union in the election. However, as the Supreme Court held in *Gissel*, "cards, though admittedly inferior to the election process, can adequately reflect employee sentiment when that process has been impeded . . . ." 395 U.S. at

603, 89 S.Ct. at 1934. Furthermore, as the Court pointed out, once bargaining is ordered the union must attempt to do its best for the majority in order to maintain its position. 395 U.S. at 612 n. 33, 89 S.Ct. 1918, 23 L.Ed.2d 547. There is nothing permanent about any bargaining order, id. at 613, 89 S.Ct. 1918, 23 L.Ed.2d 547, particularly an interim order which will last only until the final Board decision.

■■■■ Nevertheless, the issuance of a bargaining order by a district court after a union has lost an election is, undoubtedly, a serious measure which should not be undertaken whenever a claim of unfair labor practices is made. We hold only that when the Regional Director makes a showing, based on authorization cards, that the union at one point had a clear majority and that the employer then engaged in such egregious and coercive unfair labor practices as to make a fair election virtually impossible, the district court should issue a bargaining order under § 10(j). In such a case the election process has been rendered so meaningless by the employer, that the authorization cards are a clearly superior gauge of employee sentiment. A bargaining order then becomes a just and proper means of restoring the pre-unfair labor practice status quo and preventing further frustration of the purposes of the Act.

We therefore remand the case to the district court to determine if the unfair labor practices which, it found reasonable cause to believe, have been committed were in fact so serious as to warrant the issuance of an interim bargaining order.[11]

Reversed and remanded.[12]

11. On remand, the district court should consider not only the transcript of the hearing which was before the court at the time of its initial decision, but also the findings which have since been made by the administrative law judge, see note 1 supra, who heard the evidence and observed the demeanor of the witnesses.

12. Although the Regional Director did not seek to expedite this appeal, we feel that this alone

does not warrant denial of the requested injunctive relief. In Danielson v. IBEW Local 501, 509 F.2d 1371 (2d Cir. 1975), we held that under all the circumstances, including the Regional Director's failure to seek expedited appeal of denial of an injunction under § 10(*l*), the public interest was not being irreparably harmed by the absence of an injunction against an alleged secondary boycott. This case differs significantly from *IBEW Local 501*. First, that case involved § 10(*l*), which

expressly directs the Regional Director to give highest priority to cases covered by that provision. This case is brought under § 10(j), which contains no such clear command. Of course, it would still bolster the claim of the Regional Director were he to seek expedited appellate review in cases like the present one where the injury to the public interest is claimed to be serious. In the instant case, even if the district court were to issue a bargaining order promptly on remand, it will be close to two years from the time the unfair labor practices complained of occurred, a long time for the public interest to have suffered. Thus on remand, the district court is free to consider those factors mentioned in *IBEW Local 501* as affecting the availability of pre-

liminary relief so far as they are relevant. *IBEW Local 501* is distinguishable here for another reason. In this case, the issue is whether a certain form of interim relief is available. That issue will not be reviewable after the Board decides the unfair labor practice case. In *IBEW Local 501*, however, the key question was the applicability of the "right of control" doctrine in deciding whether certain union activity was properly characterized as secondary and hence illegal. That very issue would be reviewable on appeal from the Board's ultimate decision. See 509 F.2d at 1376 and n. 6; cf. Solien v. Miscellaneous Drivers Local 610, 440 F.2d 124, 127–28 (8th Cir.), cert. denied, 403 U.S. 905, 91 S.Ct. 2206, 29 L.Ed.2d 680 (1971).