Peter W. HIRSCH, Regional Director of the Fourth Region of the National Labor Relations Board, for and on Behalf of the NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

TRIM LEAN MEAT PRODUCTS, INC., Respondent,

and

United Independent Union and its Local No. 1, Party in Interest.

Civ. A. No. 79–373.

United States District Court, D. Delaware.

Nov. 7, 1979.

James W. Garvin, Jr., U.S. Atty, John X. Denney, Jr., Asst. U.S. Atty., Dept. of Justice, Wilmington, Del., John S. Irving, John E. Higgins, Jr., Harold J. Datz, N.L.R.B., Washington, D.C., Leonard Leventhal, Joanne K. Sundheim, and Leonard P. Bernstein, N.L.R.B., Region 4, Philadelphia, Pa., for petitioner.

Jacob Kreshtool, and Terry Curtis Seningen, Bader, Dorsey & Kreshtool, Wilmington, Del., for respondent.

William J. Cottrell, Philadelphia, Pa., for United Independent Union.

## OPINION

MURRAY M. SCHWARTZ, District Judge.

The Regional Director for the Fourth Region of the National Labor Relations Board ("NLRB" or "Board") has petitioned the Court to issue a temporary injunction, pursuant to section 10(j) of the National Labor Relations Act ("NLRA" or "Act"), 29 U.S.C. § 160(j),[1] to restrain respondent Trim Lean Meat Products, Inc. ("Trim Lean" or "the employer"), from committing further alleged unfair labor practices, in violation of sections 8(a)(1), (2), (3) of the Act, pending final determination of the merits by the Board. A four-day hearing was held commencing September 5, and all parties were afforded a full opportunity to be heard, to examine and cross-examine witnesses, to present evidence and to argue on the evidence and the law and to engage in post-hearing briefing, which concluded on October 18.[2] The Court, having fully considered

1. 29 U.S.C. § 160(j) provides:

The Board shall have the power upon issuance of a complaint as provided in subsection (b) charging that any person has engaged in or is engaging in an unfair labor practice, to petition any United States district court, within any district wherein the unfair labor practice in question is alleged to have occurred or wherein such person resides or transacts business, for appropriate temporary relief or restraining order. Upon the filing of any such petition the court shall cause notice thereof to be served upon such person, and thereupon shall have jurisdiction to grant to the Board such temporary relief or restraining order as it deems just and proper.

2. Mr. William J. Cottrell, Esq., represented Local Independent Union and its Local No. 1, the party in interest. Mr. Cottrell attended the first day of the hearing and participated in the formulation of the stipulation entered into by the parties. The record reflects that Mr. Cottrell was given every opportunity to participate during the remainder of the hearing (Tr. A–22–31), but chose not to do so, fully aware that

the record, arguments and briefs of counsel, will grant the Board's petition for the reasons set forth below. This opinion shall constitute the Court's findings of fact and conclusions of law, as required by Rule 52, Federal Rules of Civil Procedure.

*How the Case Arose*

On April 24, 1979, respondent recognized United Independent Union Local No. 1 ("United") as the exclusive bargaining representative of its employees in the following unit: all production and maintenance employees, shipping and receiving employees, clean-up employees, and drivers employed at its Newark, Delaware, facility, excluding clericals, guards, and supervisors. On May 15, 1979, respondent refused to recognize Local 117, Food and Commercial Workers ("Local 117")[3] as the bargaining representative of the employees in the same unit. On May 15, 1979, approximately two dozen employees in the above unit were sent home, allegedly in retaliation for their support of Local 117. As a result of these and other events, Local 117 filed charges with the NLRB, alleging violations by respondent of sections 8(a)(1), (2), (3) of the Act, 29 U.S.C. §§ 158(a)(1), (2), (3).[4] Upon investigation of these charges, the Board issued a complaint based upon its conclusion that there existed reasonable cause to believe that such violations did in fact take place. Subsequently, the Board brought this 10(j) action, seeking injunctive relief pending a full determination of the charges by the Board.

The parties have stipulated that Trim Lean, a corporation duly organized under, and existing by virtue of, the laws of the State of Delaware, and engaged in the cutting, dressing, cooking, and packaging of meat, with its principal place of business located in Newark, Delaware, is, and has been at all times herein, an employer engaged in commerce within the meaning of sections 2(2), (6), (7) of the Act, 29 U.S.C. §§ 152(2), (6), (7). It is further agreed that Local 117 and United are, and have been at all times material herein, labor organizations within the meaning of section 2(5) of the Act, 29 U.S.C. § 152(5). Therefore, this Court has jurisdiction of the parties and the subject matter of this proceeding, and under section 10(j) of the Act is empowered to grant injunctive relief.

*Role of District Court in 10(j) Proceedings*

This Court recognizes its limited role in proceedings conducted under section(10) of the Act. This section was enacted by Congress so as to provide a temporary and relatively quick mechanism for granting relief pending the outcome of often lengthy Board procedures. Congress recognized that, for many reasons, proceedings before the Board are sometimes subjected to delays and that circumstances arise in which unrelieved delay in remedying unfair labor practices would frustrate the basic purposes of the Act. *See* S.Rep.No. 105, 80th Cong., 1st Sess. 8, 27 (1947); *Hirsch v. Pick-Mt. Laurel Corp.*, 436 F.Supp. 1342 (D.N.J.1977). Accordingly, the Regional Director may petition the Court for a finding that there exists reasonable cause to believe that violations of the Act have been committed and that an injunction against such acts would be "just and proper."

■ Under section 10(j), the district court's sole function is to determine whether the reasonable cause and just and proper standards have been met, and not to determine the ultimate merits of the case before it—whether in fact a violation of the Act

---

"any non-appearance by us is at our peril." Tr. A–3.

3. At the time, this union was known as Local 117, Amalgamated Meatcutters & Butcher Workmen of America. A June, 1979 merger with the Retail Clerks International Association resulted in the change of name. (Doc. No. 9)

4. These sections provide in relevant part:
Sec. 8. (a) It shall be an unfair labor practice for an employer—

(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 7;
(2) to dominate or interfere with the formation or administration of any labor organization or contribute financial or other support to it . . . .
(3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization . . . .

has been committed. *Angle v. Sacks*, 382 F.2d 655 (10th Cir. 1967); *Hirsch, supra.* Given this limited role, the standards to be employed in weighing the evidence and legal arguments of the parties vary considerably from those usually applied.[5]

■ As a general matter, great deference is to be accorded the petitioner's evidence and legal theories. So long as the evidence favorable to the petitioner "lies within the range of rationality," *Hirsch, supra*, it is to be accepted and where more than one inference is possible, inferences favorable to the petitioner may be drawn. Moreover, the Board's legal theories are to be accepted where they are "substantial and not frivolous." *Samoff v. Building and Construction Trades Council*, 475 F.2d 203 (3d Cir.), *vacated for mootness*, 414 U.S. 808, 94 S.Ct. 151, 38 L.Ed.2d 44 (1973). Against this background, the Court will now determine whether there exists reasonable cause to believe that respondent Trim Lean has violated the Act.

*Reasonable Cause*

1. *Alleged Independent Violations of Section 8(a)(1)* [6]

■ At the outset of the hearing, the parties entered into a stipulation which recited many of the relevant events in this case. On the basis of the stipulation, as well as the testimony presented, there is reasonable cause to believe that representatives [7] of the employer questioned employees about their union activities and sympathies,[8] solicited the aid of employees in discouraging union activities,[9] threatened employees with the loss of their jobs if they persisted in their union activities,[10] created an impression of surveillance,[11] and threatened the move or shut-down of the plant

---

**5.** The Court recognizes that although the standards applied in section 10(j) proceedings have been held to be the same as those applied in proceedings under section 10(*l*) (the so-called mandatory injunction provision), there is a difference between the two sections which might, in close cases, dictate against injunctive relief under 10(j) but not under 10(*l*). This is because the conduct subject to injunction under section 10(*l*) is very often disruptive of commerce, while section 10(j) activity does not normally affect commerce as much. *See Eisenberg v. Hartz Mountain Corp.*, 519 F.2d 138 (3d Cir. 1975); *Hirsch v. Pick-Mt. Laurel Corp.*, 436 F.Supp. 1342 (D.N.J.1977).

**6.** Under the Act, all violations of sections 8(a)(2), (3), (4), (5) are derivative violations of section 8(a)(1). *See* R. Gorman, *Basic Text on Labor Law* 132 (1976).

**7.** The parties stipulated that Melody Winger and Samuel Berkowitz were statutory supervisors (Tr. A–9), and therefore, the employer can be held responsible for their acts. Although the evidence in this case does not lead the Court to conclude that there exists reasonable cause to believe that Arthur "Butch" Jones was a supervisor within the meaning of section 2(11) of the Act, the Board's theory that Jones' actions should properly be attributed to the employer is accepted. It has been held that an employer's liability for the conduct of an employee does not depend on whether that employee was technically a supervisor under the Act, but whether the rest of the employees could justifiably believe that the employee was acting for and on behalf of management. *Int'l Ass'n of Machinists v. National Labor Relations Board*, 311 U.S. 72, 61 S.Ct. 83, 85 L.Ed. 50 (1940); *Community Cash Stores, Inc.*, 1978–79 CCH NLRB ¶ 15,049 (1978); *Department Store Food Corp. of Pennsylvania*, 172 NLRB 1203 (1968), *enf'd*, 415 F.2d 74 (3d Cir. 1969); *Valley Forge Flag Co.*, 152 NLRB 1550 (1965), *remanded on other grounds*, 364 F.2d 310 (3d Cir. 1966). There is evidence that Jones represented respondent at an employee meeting (Tr. C–63), represented management's position to an employee that he could return to work if he signed a United authorization card (Tr. B–20), and solicited support for United by showing employees a list of top management representatives who had already indicated their support of United (Tr. B–102). In addition there is evidence that Jones referred to management as "we" when speaking to employees (Tr. C–106), and that employees regarded Jones as a supervisor (Tr. C–105). Finally, it is noted that Jones was a highly-salaried employee who was brought into the Trim Lean business by David Gilbert, after having worked for Gilbert for 12 years (Tr. C–130). It is concluded, therefore, that the conduct of Arthur Jones should be attributed to the employer.

**8.** Tr. A–12 (actions of Winger, S. Berkowitz); A–13, A–15, (Winger); C–64 (Jones); Tr. B–180 (S. Berkowitz).

**9.** Tr. A–12 (Winger).

**10.** Tr. A–12, A–13, A–14, A–15 (Winger), C–64 (Jones).

**11.** Tr. A–12 (S. Berkowitz).

should union activities continue,[12] all in violation of section 8(a)(1).[13]

### 2. Alleged Violations of Section 8(a)(2)

#### a. Aid to United

■ The stipulation and the testimony also make clear that there exists reasonable cause to believe that the employer, through its representatives, aided in the solicitation of authorization cards for United,[14] and conditioned employees' reinstatement or continuation of employment upon the signing of authorization cards for United,[15] in violation of section 8(a)(2) of the Act.[16]

#### b. Recognition of United

■ It is well established that a grant of exclusive recognition to a minority union constitutes unlawful support in violation of section 8(a)(2) of the Act. *See International al Ladies Garment Workers Union, AFL– CIO v. National Labor Relations Board (Bernhard-Altmann Texas Corporation)*, 366 U.S. 731, 81 S.Ct. 1603, 6 L.Ed.2d 762 (1961). The Board sets forth three theories in support of its contention that United was a minority union: First, a numerical argument, in which five authorization cards allegedly obtained by Supervisor Melody Winger are not counted, leaving United with a minority of authorization cards, second, an argument that because the cards were solicited by Arthur "Butch" Jones, an

agent of Trim Lean, they may not be counted, and, third, that the recognition of United by Trim Lean was premature since at the time of recognition Trim Lean did not employ a representative complement of its anticipated work force.

Respondent introduced 15 authorization cards signed by employees requesting United as their bargaining representative. (PX–7)[17] Of these 15 cards, those signed by Melody Winger and Mitchell Berkowitz must be excluded because they were stipulated to be supervisors (Tr. A–9, A–11),[18] leaving 13 employee cards. PX–5 is a list of employees on the Trim Lean payroll as of April 24, 1979. According to this document, 16 people were so employed. This list includes Melody Winger and Samuel Berkowitz, as well as Diane Kirkwood, a clerical employee (Tr. D–160), leaving 13 members of the bargaining unit, according to PX–5. However, David Gilbert, Secretary-Treasurer of Trim Lean, testified, to his personal knowledge, that Phillip Thornton, James Ramsey, Ronald Merion, Arthur Jones, and Fred Davis, all of whom are not listed on PX–5, were also employed by Trim Lean of April 24. (Tr. D–161) Therefore, it appears that United obtained signed authorization cards from 13 out of the 18 members of the unit. The Board undertakes a numerical analysis which hinges upon noninclusion of the five authorization cards allegedly solicited by Supervisor Winger.[19]

12. Tr. A–12, A–13, A–14, A–15 (Winger).

13. *See e. g., Cerro CATV Devices, Inc.*, 1978 CCH NLRB ¶ 19,625 (1978); *Westinghouse Electric Supply Co.*, 232 NLRB 392 (1977); *The Holding Co.*, 231 NLRB 383 (1977); *Electric-Flex Co.*, 1978–79 CCH NLRB ¶ 15,224 (1978); *Viele & Sons, Inc.*, 227 NLRB 1940 (1977); *Ohio City Manufacturing, Inc.*, 1978–79 CCH NLRB ¶ 15,342 (1978); *Hoover, Inc.*, 1978–79 CCH NLRB ¶ 15,552 (1978); *National Tape Corp.*, 187 NLRB 321 (1970); *Jo-Jo Management Corp.*, 225 NRLB 1133 (1976), enf'd, 83 LC ¶ 10,013 (2d Cir. 1977).

14. Tr. A–13, A–14, C–64–66, C–106 (Winger); B–100–03 (Jones, Winger).

15. Tr. A–14 (Jones, Winger), A–15 (Winger); B–201 (Jones); B–221, 246–47.

16. *See, e. g., International Ladies Garment Workers Union, AFL–CIO v. NLRB*, 366 U.S. 731, 81 S.Ct. 1603, 6 L.Ed.2d 762 (1961); *Seaview Manor Home for Adults*, 222 NLRB 596

(1976); *Hartz Mountain Corp.*, 228 NLRB 492 (1977), enf'd sub nom., District 65, *Distributive Workers of America v. NLRB*, 84 LC ¶ 10,830 (D.C.Cir.1978).

17. The parties agreed that all authorization cards introduced in this matter were authentic and unambiguous. Tr. B–47–50.

18. Although subsequent references in the record indicate that the parties may have forgotten that this representation of Mitchell Berkowitz' status was included in the stipulation, it is clear that such a representation was made a part of the stipulation. Although it now wishes to negate this, respondent clearly stated on the record that it was willing to be bound by the stipulation as read into the record. Tr. A–19.

19. The Board relies upon the following portion of the stipulation in asserting that five United cards were obtained by Winger:

She [Winger] led them to the office bathroom where she showed them a signed card for

Disregarding Mitchell Berkowitz' and Winger's cards as well as these additional five cards leaves the Board with a count of eight authorization cards out of 18 in the unit, a minority. The Board further reduces United's representative status by excluding Arthur Jones from the unit and not counting his card because of his alleged supervisory status, and then argues that since employees James Ramsey, Ronald Merion and Phillip Thornton are not listed on PX–5, they were not employed during the payroll period during which recognition was granted, and their authorization cards are therefore invalid. According to the Board, then, only four valid authorization cards remain.

The Court does not accept the Board's reasoning. First, there was no showing as to which of the authorization cards were allegedly obtained by Supervisor Winger; there is a possibility that some of the cards may have been counted twice for the Board's purposes of exclusion. Moreover, the clear testimony of Gilbert was that Thornton, Merion and Ramsey were employed on April 24 notwithstanding not being listed on PX–5 and therefore their authorization cards should be counted. Finally, it has been held that the evidence indicates that Arthur Jones was not a supervisor and should be a member of the unit. *See* note 7 *supra*, (Tr. C–133–34). It is held, therefore on reasonable belief that United obtained cards from 13 of the 18 unit members.

The Board's second contention with respect to United's minority status is that all United cards must be excluded since Arthur Jones aided in the solicitation of these cards.[20] The Board's theory is that since Jones was held out by Trim Lean to be a representative of management, his aid in obtaining signed United cards from employees constituted assistance by Trim Lean to United thereby invalidating the cards and the recognition.

Although Jones was not a supervisory employee, the employees could justifiably have thought that he was an agent of the employer. *See* note 7 *supra*. Any numerical majority which United may have had at the time of recognition was tainted by the unlawful assistance and support rendered by Jones in obtaining employee signatures to authorization cards and therefore, at no time reflected that complete freedom of choice of the signers which the Act contemplates. *Department Store Food Corp. of Pennsylvania*, 172 NLRB 1203 (1968), *enf'd* 415 F.2d 74 (3d Cir. 1969). Therefore, there is reasonable cause to believe the recognition of United is invalid on this ground. *Int'l Ass'n of Machinists v. NLRB*, 311 U.S. 72, 61 S.Ct. 83, 85 L.Ed. 50 (1940); *Hartz Mountain Corp.*, 228 NLRB 492 (1977), *enf'd*, 84 LC ¶ 10,839 (D.C.Cir. 1978).

Petitioner's final contention is that the recognition of United was premature since at the time respondent did not employ a representative complement of its anticipated work force. It is clear that at the time of the recognition Trim Lean had not yet commenced production. (Tr. C–132) David Gilbert testified that the company was gearing up for the opening of processing lines. Equipment was being installed and tested, the plant was being cleaned, and employees were being hired. (Tr. C–132–33, C–183) With respect to the number of persons employed by Trim Lean, it has already been established that there were 18 members of the bargaining unit as of April 24. While Trim Lean's records are far from adequate and the testimony of its officers often conflicted, it is possible for the Court to determine that a significant increase in

---

United. Winger said a dock person signed it, and that she had five cards, all signed by dock people.
Tr. A–14.

Even assuming that the Court draws the inference that these five cards were in fact solicited by Winger, as opposed to merely being in her possession, the Board's reasoning with respect to the effect of these cards on United's status is not accepted. *See infra.*

**20.** It is uncontradicted that Jones dated all the United cards (Tr. A–11, C–175) and gave them to David Gilbert (C–178). In addition, there was testimony that Jones stated to employees that "he was local one; he was the union" (C–109), and that David Gilbert stated to an employee that "Butch and Melody brought [the union] in." (Tr. B–195)

Trim Lean's work force occurred between April 24 and May 15. Indeed, as demonstrated by PX–4, the payroll record for the period from April 25 to May 4, 1979, there were 45 bargaining unit members employed by May 4. This is a substantial increase over the work force employed at the time Trim Lean recognized United. Further evidence of Trim Lean's premature recognition is provided by Gilbert's testimony that on April 24 he was still in the process of hiring new employees (Tr. C–131), and the fact that the former Trim Cut employees laid off in March[21] began working as early as April 25. (Tr. C–155)[22]

It is well established that by recognizing a union at a time when that union is not the representative of a "normal and representative functioning bargaining unit of employees," an employer violates section 8(a)(2) of the Act. *Diamond International Corp.*, 229 NLRB 1314 (1977); *Allied Products Corp.*, 220 NLRB 732 (1975); *Crown Cork & Seal Co.*, 182 NLRB 657 (1970); *Lianco Container Corp.*, 173 NLRB 1444 (1969). By recognizing a bargaining representative based upon the desires of a majority of 18 employees, at a time when the plant was not in operation and the work force not fully determined, there is reason to believe that Trim Lean has denied a majority of its employees their rights under section 7 of the Act to select a collective bargaining agent of their own choosing and has instead imposed upon these employees its own choice of representative. Thus, both the

Board's second and third contentions with regard to United's minority status are accepted; they are based upon substantial legal theories as well as the evidence adduced at the hearing. It is concluded that there exists reasonable cause to believe that Trim Lean violated section 8(a)(2) by recognizing United.[23]

3. *Alleged Violations of Section 8(a)(3)*

On May 15, at approximately 9:40 a. m., the employees working on the meat processing belt were sent home by Supervisor Melody Winger. At the hearing, more than 20 of these employees testified that this occurred within ten minutes after the employees had met, during a break, with a Local 117 representative to discuss the company's refusal to recognize Local 117.[24] There was also evidence that Winger stated at the time of the belt shut-down that "if you sign with our union, you can come back tomorrow or you can come back after lunch." (Tr. B–100) Gilbert and Jan Berkowitz testified that the employees were not discharged but rather walked off the job. However, given the clear and consistent testimony of the employees, it is concluded that there exists reasonable cause to believe that these employees were discharged in violation of section 8(a)(3) of the Act. *See e. g., Vernon Devices, Inc.*, 215 NLRB 475 (1974).

The Board further alleges that employees David Small and Kathy Keener were dis-

---

**21.** The predecessor to Trim Lean, Trim Cut Distributing Co., went out of business. On March 26, 1979, Melody Winger introduced David Gilbert to the Trim Cut employees as the new owner. Gilbert told the employees that Trim Cut was closing as of that date, that it would reopen shortly as Trim Lean, and that they would be recalled from layoff to work for Trim Lean if they so desired (Tr. C–182). The vast majority of the employees discharged by Trim Lean were, in fact, former Trim Cut employees.

**22.** It is also noted that Gilbert never verified the validity of the authorization cards by cross-checking the cards with employee lists (Tr. C–184–85), but sent the cards directly to United. Gilbert also traveled to United's office a few days later to sign a recognition agreement. These highly irregular and hurried activities

support a finding of premature recognition. *See Hartz Mountain Corp.*, 228 NLRB 492, 526–276 (1977), *enf'd*, 84 LC ¶ 10,830 (D.C.Cir. 1978).

**23.** It is also worth noting that the employer continued soliciting United authorization cards two months after the recognition of United. (Tr. C–64–66, C–105–06) This leads the Court to conclude that even the employer did not believe that its recognition was valid.

**24.** At the hearing, Trim Lean requested that prospective witnesses be sequestered, "the purpose being to avoid the possibility of shading or the temptation to shade testimony." (Tr. B–20) The fact that these witnesses were sequestered makes their relatively consistent testimony concerning the events of May 15 most persuasive.

charged earlier on the morning of May 15 for supporting Local 117. There is reasonable cause to believe that this is true. Small's discharge followed by a short time the demand for recognition by Local 117. Gerry Birl, Vice-President of Local 117, presented the union's signed authorization cards to Gilbert and Jan Berkowitz, President of Trim Lean, at approximately 8:00 that morning and Berkowitz noted the presence of Small's signed authorization card. (Tr. B–24) Earlier that morning, Sam Berkowitz had told several employees that he knew that Small was one of the leaders of the union organizing drive. (Tr. A–12) There was also testimony that Jan Berkowitz told an employee "Dave Small can come back to work but he had a big mouth, he'd have to keep his mouth shut." (Tr. B–215) The employer introduced no evidence that would support the asserted reason for Small's discharge, low production. Ms. Keener was discharged for allegedly leaving her work station to go to the bathroom. However, she testified without contradiction that there was no company rule about leaving the work station to go to the bathroom and that it was the company practice for employees to leave whenever they wanted to for that purpose. Moreover, Keener had never before been warned about leaving her station to go to the bathroom. (Tr. B–87–90)

The Board contends that Trim Lean decided to make Small and Keener examples to other employees in the plant by demonstrating that card signers for Local 117 were expendable. Based on the timing of the discharges, shortly after the company became aware of an effort to organize Local 117, Trim Lean's failure to present evidence to show that the discharges were for cause, and Trim Lean's anti-union animus as shown by the evidence of other violations of the Act, the Court finds that there exists reasonable cause to believe that the discharges of David Small and Kathy

Keener were motivated by anti-union considerations in violation of section 8(a)(3). *See Cerro CATV Devices, Inc.*, 1978 CCH NLRB ¶ 19,652 (1978).

■ Trim Lean presented evidence that it offered reinstatement to the discharged employees on two occasions and that these offers were not accepted by the employees,[25] and argues that therefore reinstatement is precluded as a remedy in this matter. The Board counters that these offers were invalid since they gave the employees too short a period of time in which to respond. The Board's argument is based upon case law holding that discharged employees are entitled to a reasonable period of time in which to respond to an employer's reinstatement offer. *See, e. g., Freehold AMC-Jeep Corp.*, 230 NLRB 903 (1977); *Southern Household Products Co., Inc.*, 203 NLRB 881 (1973); *Penco Enterprises, Inc.*, 216 NLRB 734 (1975); *Murray Products, Inc.*, 228 NLRB 268 (1977); *Thermoid Co.*, 90 NLRB 614 (1950). There is no per se rule requiring a minimum period of prior notification in an offer of reinstatement; the appropriate period is to be determined from the totality of the circumstances, including the employer's acts of discrimination and their effect on the employees, any false or misleading statements made to the employees regarding their status and the discriminatee's interim employment. *Murray Products, supra.*

■ The first reinstatement offers, sent via Western Union to the employees during the evening of May 17, instructed them to report to work at 6:30 the following morning.[26] In addition to providing the employees with a very limited opportunity to consider their employer's offer (less than 12 hours), the offer is not unconditional as is required. *NLRB v. W. C. McQuaide, Inc.*, 552 F.2d 519 (3d Cir. 1977); *Thermoid Co., supra.* Although the text states that the

---

**25.** Two employees did return to work shortly after May 15, Richard Cresswell and Cynthia Williams. Tr. A–19.

**26.** These mailgrams read:

We have told the pickets, and we are telling you that no one has been fired. We welcome you to come back to work on Friday, May 18, 1979 at 6:30AM, without conditions before we are forced to replace you. We do not and cannot recognize Local 117.
Trim-Lean Meat Products Inc.

employees are welcomed back "without conditions," the final sentence states "We do not and cannot recognize Local 117." The ambiguous nature of this telegram could improperly lead employees to believe that further union activity on their part would result in action taken against them by the company. *See Thermoid Co., supra.* Moreover, the statement that "no one has been fired" directly contradicts a previous statement by Sam Berkowitz indicating to those employees on the picket line that they had indeed been fired. (Tr.B–102, B–171) It is concluded then that there is reasonable cause to believe that the May offers of reinstatement were defective.

In July, the employer again offered reinstatements to the discharged employees.[27] Those offers sent on Monday, July 9 , instructed the employees to report on Thursday, July 12, and those sent on Thursday, July 12, instructed employees to report on Monday, July 16. While the language of the offer is unconditional,[28] it would appear that too short a period of time was provided employees to report to work. By this time two months had passed and many of the employees had either secured other employment or had established other commitments which made the reporting dates impossible to meet. *See Murray Products, supra.* Many employees testified that they needed

additional time in which to provide notice to their interim employers or to arrange for babysitters and the like. Under these circumstances, and given the employer's negative response to employees who requested short time extensions,[29] the Board's reasoning with regard to the validity of the July telegrams is accepted.

Thus, the employer's offers of reinstatement do not preclude the issuance of a reinstatement order by this Court should one be found to be "just and proper."[30]

*"Just and Proper" Standard*

▮▮▮▮▮▮ The district court is empowered to grant temporary injunctive relief in a section 10(j) proceeding where such relief is found to be "just and proper." Where "there exists a probability that the purposes of the Act will be frustrated unless temporary relief is granted," the just and proper standard is met. *Angle v. Sacks,* 382 F.2d 655 (10th Cir. 1967); *Hirsch, supra.* Restoration of the status quo as it existed prior to the onset of unfair labor practices is a particularly significant consideration in the decision to grant temporary relief. *Angle, supra. Seeler v. Trading Port, Inc.,* 517 F.2d 33 (2d Cir. 1975). Further, it is settled that in seeking injunctive relief the Board is to act in the public interest and not in the vindication of purely private rights. *See*

---

**27.** These offers read in substance (the dates cited varied):

You are offered reinstatement to your old job. Report at 6:30AM Thursday July 12, 1979. Same job, same pay. There are no conditions. You have the legal right to join and help and the legal right not to join and not to help any union you want as you choose. Trim Lean will not question or discriminate in any way because of any past or future lawful union activity by any employee.
Trim Lean Meat Products, Inc.

**28.** Although some employees were confused by the language of the offer, particularly as it referred to their right "not to join and not to help any union" (Tr. B–137), the Court finds this offer to be unconditional. Section 7 of the Act—"Rights of Employees"—states that while employees have the right, *inter alia,* to self-organization and to bargain collectively, they also have the right "to refrain from any and all such activities." Trim Lean apparently attempted to follow the language of section 7 in its July offer.

**29.** *See, e. g.,* Tr. C–21–22, C–4–5, B–251–52, B–182–88, B–103, B–223–25, B–127, B–135, B–173–74. Gilbert testified that, in his view, two weeks' notice to interim employees was an unreasonable amount of time (Tr. B–43), and that he denied such requests by discriminatees. However, Gilbert also testified that when he was hiring employees to begin work at Trim Lean in April, he permitted employees to give two weeks' notice to their present employers. (Tr. D–65)

**30.** Since the Court has found on reasonable belief that the employer's offers were invalid, it need not reach respondent's contention that the employees acted unreasonably by not reporting to work or applying for a position. The Board has held that the burden may not be placed upon a discriminatee to respond to an unreasonable offer, even if that employee is engaged in picketing and is physically able to return to work immediately. *Murray Products, Inc.,* 228 NLRB 268 (1977); *Harrah's Club,* 158 NLRB 758 (1966), *remanded,* 403 F.2d 865 (9th Cir. 1968).

*Eisenberg v. Hartz Mountain Corp.*, 519 F.2d 138 (3d Cir. 1975). Finally, traditional equitable factors normally applied in determining the appropriateness of injunctive relief are not applied in a section 10(j) proceeding. *Levine v. C & W Mining Co., Inc.*, 465 F.Supp. 690 (N.D.Ohio 1979).

■ Applying the above principles, the Court holds that injunctive relief would be just and proper. It has already been concluded that there exists reasonable cause to believe that Trim Lean has interfered with the employees' section 7 rights, unlawfully aided United, in effect imposing that union upon its employees, and unlawfully discharged over twenty supporters of Local 117 in violation of sections 8(a)(1), (2), (3) of the Act. These actions have most likely had a drastic impact upon the organizational support of 117. The conduct violative of sections 8(a)(1) and 8(a)(3) not only substantially diminishes the desire of Trim Lean employees to select Local 117 as their bargaining representative, but eliminates Local 117 supporters from the company altogether. At the same time, the employer's 8(a)(2) conduct has entrenched United, a minority union selected by only 13 employees before the employer began full operations, as the collective bargaining representative of all its employees in the appropriate unit.

Violations of the Act by Trim Lean did not cease on May 15. On the contrary, it is found that its efforts to solicit support for United, to condition employment upon employee support of United, and to threaten employees with loss of jobs for supporting Local 117 continued, at least through June. (Tr. C–64–66, C–105–06) There is no evidence that such activities have ceased, or will not be repeated. It is further found that the employer's conduct has nullified the possibility that a fair election can be held.

The longer these violations go unremedied, the less likely it is that the policies of the Act, such as according employees a free and unhampered right to choose their own collective bargaining representatives, and allowing employees to reap the benefits of collective bargaining conducted by these representatives, can be effectuated. Absent injunctive relief, the employer will be free to deal with United as though that union had been properly selected by a majority of its employees, while further undermining the strength of Local 117 through its unlawful conduct. In this case, it is obvious that restoration of the status quo as it existed prior to the onset of the alleged unfair labor practices must go beyond a court order directing the employer to refrain from discriminating against employees or from contributing support to United in the future; the discharged employees must be offered reinstatement, so as to enable Local 117 to regain the organizational strength it possessed prior to May 15.[31] *See Angle v. Sacks, supra; Smith v. Old Angus, Inc. of Md.*, 69 LC ¶ 13,229 (D.Md. 1973).

This Court's order will also require Trim Lean to bargain with Local 117. While the issuance of a bargaining order is usually reserved to the exclusive province of the Board, and there are obvious conceptual difficulties with a district court issuing a bargaining order, such an order has been held to be an appropriate remedy in a section 10(j) proceeding. *See, e. g., Seeler, supra; Levine, supra; Smith v. Old Angus, supra; Henderson v. Gibbons & Reed Co.*, 53 LC ¶ 11,081 (D.N.M.1966).

In *NLRB v. Gissel Packing Co.*, 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969), the

---

**31.** The Court's order cannot affect Richard Cresswell and Cynthia Williams, both of whom returned to work at Trim Lean in May. Apparently, the Board is also of this view, since these two employees have been omitted from the Board's proposed order (Doc. No. 11).

There was some dispute as to the status of Darnell Earl. Although the Board concedes that Earl was not discharged by the employer, it contends that Earl, as an unfair labor practice striker, is entitled to reinstatement. There is no doubt that the strike which began at Trim Lean shortly after May 15 was a response to alleged unfair labor practices. (Tr. B–42) Earl testified that he decided to join the picket line rather than return to work as requested by the employer. (Tr. C–80–81, C–83) The Court finds, on reasonable belief, that Earl was an unfair labor practice striker and, as such, he is entitled to a valid offer of reinstatement. *John G. Merkel & Sons, Inc.*, 232 NLRB 140 (1977); *National Tape Corp.*, 187 NLRB 321 (1970).

Supreme Court upheld a Board-issued bargaining order in cases in which a majority union was confronted with employer unfair labor practices that had the effect of undermining the union's majority strength and preventing the holding of a fair and impartial election. In such cases, the showing of majority support can be based upon authorization cards for, as the Supreme Court declared in *Gissel,* "cards, though admittedly inferior to the election process, can adequately reflect employee sentiment when that process has been impeded . . . ." 395 U.S. at 603, 89 S.Ct. at 1934. Such an order can be issued by a district court in a 10(j) proceeding as well under the same circumstances. The Second Circuit Court of Appeals in *Seeler v. Trading Port, Inc.,* *supra* at 40, set forth its standard for determining when a bargaining order should issue in a section 10(j) proceeding and the rationale behind such an order:

> When the Regional Director makes a showing, based on authorization cards, that the union at one point had the clear majority and that the employer then engaged in such egregious and coercive unfair labor practices as to make a fair election virtually impossible, the district court should issue a bargaining order under section 10(j). In such a case, the election process has been rendered so meaningless by the employer, that the authorization cards are a clearly superior gauge of employee sentiment. A bargaining order then becomes a just and proper means of restoring the pre-unfair labor practice status quo and preventing further frustration of the Act.

In a more recent decision, the District Court for the Northern District of Ohio set forth the circumstances under which a bargaining order should issue in a 10(j) proceeding:

> In circumstances where employer misconduct virtually nullifies the possibility of a free election, and ample objective evidence, such as signed, unambiguous authorization cards, exist to demonstrate the prior majority status of the Union, a

bargaining order is proper. . . . A bargaining order is warranted in this case. The Court has found on reasonable belief that unambiguous authorization cards establish the Union's majority status; the Company subsequently refused to bargain with the Union; the Company undermined Union strength, eventually destroying Union representation, by engaging in numerous, flagrant unfair practices; the Company is continuing to refuse to bargain and to commit other unfair labor practices with the aim of insuring that no seeds of unionization will germinate in the future; . . . .

*Levine v. C & W Mining Co.,* 465 F.Supp. 690 at 694 (N.D.Ohio 1979).

■■■■ The Board presented evidence of 30 signed authorization cards for Local 117. (PX–1, PX–2) However, this Court has reasonable cause to believe that only 28 of these cards were signed by persons employed by Trim Lean on May 15, the date Local 117 demanded recognition.[32] There is absolutely no evidence in the record that Aaron Sauder or Allen Dunn were so employed. Therefore, their cards cannot be counted and the Board must show that a unit of 55 members or less existed on May 15 to establish Local 117's majority status.

It is a mild understatement that the company's personnel records for the period mid-April to early June are woefully inadequate. Sam Berkowitz and David Gilbert often contradicted themselves and each other in interpreting payroll records and employee time cards. The company ultimately adopted the position that a notation of May 25, a Friday, on an employee's payroll record (PX–6) indicates that that employee was employed by the company during the week ending May 18, the week in which recognition of Local 117 was refused. The Court is of the firm belief that this interpretation is incorrect. First, the payroll records of the discriminatees do not indicate a May 25 payroll date, in contrast to uncontradicted testimony that they were employed during the week ending May 18. Second, PX–9 and PX–10[33] establish that

<hr>

**32.** This includes the authorization card of Darnell Earl. *See infra.*

**33.** PX–10 consists of letters written to two of the discharged employees, accompanied by

payroll entries ending May 18, rather than May 25, are the appropriate documentation for establishing the employee roster of the week of May 18. These documents also clearly indicate that time cards for the week ending May 18 reference the number of hours worked that week, and not the week prior as Jan Berkowitz testified. (Tr. D–120)

Unfortunately, although they were under a subpoena to produce time cards for the week of May 18, the company did not do so, claiming that such records either did not exist at all or no longer existed. PX–10 clearly establishes that such records were kept at one time.[34] Absent time cards for the week, it is impossible to establish to a precise certainty how many employees with a May 18 payroll entry were actually employed on the 15th and how many began working for the company later in the week. This task is made even more difficult by the lack of any personnel records indicating an employee's date of hire and first day of work. While the Court stops short of finding that respondent has deliberately failed to produce documents in its possession, or that it intentionally obfuscated the record, it will not permit the company to reap any rewards from its inadequate personnel practices and unexplained loss of critical documents detrimental to its position.

According to PX–6, there were 50 members of the unit employed during the week ending May 18. However, PX–6 does not reflect seven employees[35] established to have been employed on May 15, resulting in a unit of 57. Two of these employees must be excluded; Mitchell Berkowitz was a supervisor (Tr. A–11) and Diane Kirkwood

was a clerical employee. (Tr. D–160) This leaves a bargaining unit of 55 employees. Local 117 obtained cards from 28 employees, a majority. This calculation is arrived at by including Darnell Earl as an employee on May 15. Earl testified that he worked only one day for Trim Lean following his recall from layoff. (Tr. C–82) He did not work for two weeks prior to May 15 because of an accident. (Tr. C–80) Some time after May 15, Earl reported to Trim Lean, and asked Winger whether he "still had a job;" Winger told him he did. As noted earlier, however, Earl elected not to return to work but decided to join the picket line. From this evidence, the Court draws the inference that the employer regarded Earl as an employee, as did Earl himself, and thus his authorization card will be counted, and he will be included in the calculation of the unit.

Even if Earl is not included, however, there still exists reasonable cause to believe that Local 117 enjoyed majority support. The PX–6 records of 11 employees indicate that these employees may not have been employed on May 15, because the hours they worked the week ending May 18 constitute considerably less than a full 40–hour week.[36] Jan Berkowitz, in interpreting the April records, testified that employees with less than 24 hours in a given payroll week probably only worked the last three days of the week. (Tr. D–149) Because a massive reduction in the work force occurred on May 15 as a result of the employer's mass discharge, it is likely that the employer hired new employees to begin work on May

their time cards for the week ending May 18. It is clear from this that the number of hours worked according to the May 18 time card corresponds to a payroll entry of May 18 on PX–6. PX–9 consists of several employee time cards in which the same is true. For example, the hours worked by Freddie Davis the week ending May 4, correspond to the payroll entry of May 4 on Davis' payroll record in PX–6.

**34.** It is noted that respondent did produce time cards for the week ending May 25 which would enhance its position if its interpretation of PX–6 were accepted by the Court.

**35.** These employees are Ricky Hardin (Tr. B–76), Kathy Keener (Tr. B–83), David Small (Tr. B–54), William Mason (Tr. B–237), Bart McCloskey (Tr. C–104), Dan Gibson (Tr. B–104), and Gary Coleman (Tr. C–47).

**36.** These employees are George Baker ($16\frac{1}{3}$ hours), Gary Evans ($8\frac{1}{4}$ hours), Andrea Finerty ($16\frac{3}{4}$ hours), Dorothy Leisfer (23 hours), Thomas Massetti (3 hours), Christie McCloskey ($26\frac{3}{4}$ hours), Robert McCurdy ($16\frac{1}{2}$ hours), Donald McCurdy ($16\frac{1}{2}$ hours), Robert Nolan ($7\frac{1}{4}$ hours), Todd O'Donnell ($17\frac{1}{4}$ hours), Ralph Tribuani ($26\frac{1}{4}$ hours).

16, 17 or 18. Trim Lean has presented no proof that these 11 individuals were employed on May 15 and as noted, its records do not reflect an employee's first day of work. Thus, the Court concludes that it is very likely that at least one, and as many as 11 employees listed on PX–6 were not employed on May 15 and should be excluded from the unit. This would result in a bargaining unit of a maximum of 53 employees and a minimum of 43. With 27 valid authorization cards, not including Earl's, having been obtained by Local 117, there still exists reasonable cause to believe that Local 117 enjoyed the support of a majority of Trim Lean employees in the appropriate bargaining unit.

The Court has found then, on reasonable belief, that Local 117 represented a majority of the appropriate unit when it demanded recognition on May 15, that the employer's unfair labor practices have had the effect of undermining Local 117's majority status, while entrenching United, a minority union, as the bargaining representative of the Trim Lean employees, that these unfair labor practices continued at least through June, and that a free and unhampered election would not be possible due to the employer's anti-union conduct. Under these circumstances, a bargaining order, based on Local 117's majority status as demonstrated by authorization cards, is warranted.

For the reasons set forth above, an order granting the Board's petition for preliminary injunction will be entered.